In the

# United States Court of Appeals
### For the Seventh Circuit

No. 01-4208

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOHN VEYSEY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 381—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED JUNE 2, 2003—DECIDED JUNE 26, 2003

Before POSNER, EASTERBROOK, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* John Veysey appeals from his conviction, after a jury trial, and sentence of 110 years in prison for mail and wire fraud, arson, and the related offense of felony by fire. The facts are amazing, but we shall resist the temptation to recount them at length. In 1991 Veysey set fire to his house and inflated the claim that he then filed with his insurer. The insurer paid, and the house was rebuilt. The following year Veysey married a woman named Kemp, increased the insurance on the house, removed the valuable contents of the house,

along with himself and his wife, and then cut the natural-gas line inside the house, causing the house to fill up with gas and explode spectacularly, utterly destroying it. He grossly exaggerated the value of the property allegedly lost in the explosion—some did not exist and some he had removed before the explosion. The insurance company (a different one) paid, and he used part of the proceeds to buy another house. The next year he tried to kill his wife by driving his van with her in it into a river. When that failed he killed her by poisoning her, and collected $200,000 in the proceeds of insurance policies on her life. He placed personal ads in newspapers, seeking to meet women. He became engaged to one of the women he met through his ads, named Donner, but broke his engagement after failing to procure a $1 million policy on her life. He then took up with a Ms. Beetle. This was in 1996 and the same year he burned down his house, again submitting an inflated estimate of the loss and receiving substantial proceeds from the insurance company (a different one, again). He then married Beetle, and they moved into a rented house. She insured her life for $500,000 with him as beneficiary. One night in 1998, after drugging her, he set fire to the house, hoping to kill both her and their infant son, on whom he had also taken out a life insurance policy and who was in the house with her. They were rescued, and soon afterwards Veysey and Beetle divorced. The house was rebuilt and Veysey persuaded a woman named Hilkin to move in with him after she had accumulated some $700,000 in life insurance and named him as the primary beneficiary. He apparently intended to murder her, but he was arrested before his plans matured. There is more, but these are the highlights.

We reverse the usual order of discussion and begin with the sentence, since the reader may wonder how, egregious as Veysey's conduct was, it warranted the equiva-

lent of a life sentence when the single count of arson (the burning down of the rented house) carried a maximum sentence of 20 years, mail and wire fraud carry a maximum sentence of 5 years, and the use of fire in a felony (its use to commit the mail and wire fraud, that is, the fraud against the fire and life insurance companies) carries a maximum sentence of 10 years. The answer is that Veysey was convicted of 16 separate counts of mail or wire fraud and that the judge imposed the maximum sentence of 5 years on each count and made the sentences run consecutively, for a total of 80 years, and consecutively as well to the 20-year sentence for arson that she imposed and the 10-year sentence for using fire in a felony that she also imposed; thus 110 years.

The federal sentencing guidelines direct the judge, when there are multiple counts of conviction, to impose maximum and consecutive sentences to the extent necessary to make the total punishment equal in severity to what the guidelines would require were it not for the statutory maxima. U.S.S.G. § 5G1.2(d); see also *United States v. Dumes*, 313 F.3d 372, 384 (7th Cir. 2002). Because Veysey's remarkable spree included murder as well as attempted murder, multiple arsons, and multiple frauds, the guideline sentence would have been life. U.S.S.G. §§ 2A1.1(a), 2F1.1, Application Note 14; see also *United States v. Lanas*, 324 F.3d 894, 904 (7th Cir. 2003). The judge exceeded no statutory maximum in producing an equivalent sentence.

Because Veysey's sentence exceeded no statutory maximum, the rule of *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), was not violated. *Apprendi* holds that a fact which results in a sentence greater than what, were it not for the fact, would be the statutory maximum sentence for the defendant's crime must be proved beyond a reasonable doubt. *United States v. Bjorkman*, 270 F.3d 482, 491 (7th

Cir. 2001). So if the maximum sentence for arson of a nonresidential building were 10 years but of a residence 20, a defendant could not be sentenced to more than 10 years without proof beyond a reasonable doubt that the building he had set fire to was indeed a residence. But a fact that merely moves the defendant's sentence around *within* the statutory sentencing range need not be proved beyond a reasonable doubt. *Harris v. United States*, 536 U.S. 545, 550 (2002); *Thomas v. United States*, 328 F.3d 305, 309 (7th Cir. 2003); *United States v. De la Torre*, 327 F.3d 605, 611 (7th Cir. 2003).

Veysey contends that the case should have been severed for trial into seven different trials, but this is another frivolous claim, and likewise his objection to evidence concerning his drugging of still another woman. So closely related were all Veysey's criminal acts that if there had been seven trials *all* those acts would have been placed in evidence in *all* the trials, as showing intent, modus operandi, and the scope of the scheme to defraud. *United States v. Prevatte*, 16 F.3d 767 (7th Cir 1994); *United States v. McGauley*, 279 F.3d 62, 74 (1st Cir. 2002); *United States v. Prosperi*, 201 F.3d 1335, 1345 (11th Cir. 2000).

More substantial is Veysey's contention that the arson of the rented house was not subject to the federal arson statute because the house was not "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce," as required by the federal arson statute. 18 U.S.C. § 844(i). The Supreme Court has held that arson of an owner-occupied home is not within the statute's reach because home ownership is not an activity affecting commerce, *Jones v. United States*, 529 U.S. 848 (2000)—which is why Veysey's other three arsons were not charged under the statute—but that arson of an apartment building consisting of rental units is within the statute

because the rental of real estate is an activity affecting commerce. *United States v. Russell*, 471 U.S. 858 (1985). Between the two cases the Supreme Court's conception of interstate commerce narrowed, but *Jones* reaffirms *Russell*, see 529 U.S. at 853-56, and we are given no reason to doubt the continued authority of the earlier case.

The present case nestles somewhere in between *Jones* and *Russell*. The house was rented but the renter was not engaged in a commercial activity, as was the apartment house owner in *Russell*. The owner of the house that Veysey rented was a typical householder, who after living in the house for several years had moved to another state and after trying unsuccessfully to sell the house decided to rent it. He rented it first to a family for six months and then to Veysey for a year at a monthly rental of $1,300. The lease gave Veysey an option to buy the house at the end of the year for $138,000. Had Veysey burned down the house while the original owner was living in it, or had he burned it down after exercising his option and buying the house, the arson would have been beyond the reach of the federal statute, by virtue of the *Jones* case. At argument a member of the court remarked the awkwardness of property drifting in and out of interstate commerce. And under pressure of that awkwardness one might try to distinguish the present case from *Russell* by noting that the owner of the apartment building in that case was in the business of renting, while the owner of the house that Veysey torched was an accidental renter. He rented the house only because he couldn't sell it at an acceptable price. He didn't *want* to be in the real estate rental business. But he was, and the real estate rental market is interstate, as this case illustrates; the owner was in a different state both when he rented the house to Veysey and when the arson occurred. To decide this case differently from *Russell* would imply a need to inquire in every

case into the motives for renting, and the inquiry would complicate decision making without offsetting gain. We repeat that the real estate rental market really is an interstate market and the rental in this case was an interstate transaction.

The last issue we consider is Veysey's objection to testimony by an actuary, Charles L. McClenahan, that the probability of four residential fires occurring by chance during the 106 months between April 1989 (when Veysey bought the first house that he is known to have set fire to) and January 1998 (when he set fire to his last house) was only one in 1.773 trillion; he described this as a conservative estimate. We can imagine two distinct grounds for Veysey's objection to the actuary's evidence. The first, which, though the stronger, Veysey's lawyer has not made—and in fact expressly disclaimed, when pressed, at argument—is that the calculation was based on implicit assumptions that are untenable.

A simplified version of what the actuary did is that he first determined the number of serious residential fires in the United States over the interval in which houses occupied by Veysey caught fire four times (with "serious" defined as a fire that caused a loss equal to or greater than 20 percent of the amount of fire insurance on the house, and so defined serious fires are 5.3 percent of all residential fires), then divided that number by the number of houses in the United States, and finally multiplied the resulting probability by itself four times. Suppose (we are using hypothetical figures for the sake of simplicity) the probability that a specific house would have caught fire during the 106-month interval were one in 1,000. Then, on the assumption of independence (an important qualification, discussed next), the probability that two specific houses would have caught fire during the interval would

be one in a million (1/1,000 x 1/1,000), the probability that three specific houses would have caught fire would be one in a billion, and the probability that four would have caught fire would be one in a trillion.

This simplified calculation does modest violence to the actuary's method, as the mathematics of repeatable events is somewhat complex. When the actuary divided the number of fires by the number of houses, the resulting quotient was not *really* the probability of a fire happening to a specific house, but an input into a formula designed to assess the probability of a repeated event, in this case a serious fire in a series of Veysey's dwellings. But as with our simple version, the actuary's actual computation assumed that the probabilities of each of a person's multiple fires are independent of each other—that the fact that you had a fire at one time or in one of your houses would not affect the probability that you would have a second fire in that house or a fire in your next house. The assumption was not defended by the actuary, and is unrealistic. Compare *Branion v. Gramley*, 855 F.2d 1256, 1265 (7th Cir. 1988). A fire in a house or in an apartment is likely to be the result, at least in part, of carelessness on the part of the occupant, implying that he is more likely to have another fire than a person who has never had a fire (though against this it can be argued that someone who has experienced a fire will be more careful to avoid a repetition—once burned is twice shy). Moreover, even if the assumption of independence were defensible, the actuary's calculation would be flawed by his failure to limit the reference group to residences comparable in design, materials, age, value, region, and other factors relevant to the likelihood of a fire in Veysey's residences.

But Veysey as we have said does not object to the actuary's methodology. His objection is that the actuary

usurped the jury's function by testifying in effect that Veysey was guilty of the crimes with which he was charged *way* beyond a reasonable doubt, as the probability of his innocence was not 1 or 2 or 5 percent or whatever might be thought the implicit probability of innocence sufficient to prevent a finding of guilt beyond a reasonable doubt, but, if the actuary was believed, a mere .0000000000564 percent. Veysey's counsel goes so far as to argue that statistical evidence should never be admissible to establish an element of a crime. Fingerprint or DNA evidence is admissible, he acknowledges, but the jury must not be told what the probability is that such evidence actually establishes the proposition for which it is introduced, such as that the defendant's fingerprints were on the murder weapon.

In making this argument Veysey's counsel is gesturing toward an academic literature (well summarized in Ronald J. Allen, "On the Significance of Batting Averages and Strikeout Totals: A Clarification of the 'Naked Statistical Evidence' Debate, the Meaning of 'Evidence,' and the Requirement of Proof Beyond A Reasonable Doubt," 65 *Tul. L. Rev.* 1093 (1991)) that argues that judges and jurors, because they lack knowledge of statistical theory, are both overawed and easily deceived by statistical evidence, see, e.g., Laurence H. Tribe, "Trial by Mathematics: Precision and Ritual in the Legal Process," 84 *Harv. L. Rev.* 1329 (1971); Charles Nesson, "The Evidence or the Event? On Judicial Proof and the Acceptability of Verdicts," 98 *Harv. L. Rev.* 1357, 1378-85 (1985); Craig R. Callen, "Adjudication and the Appearance of Statistical Evidence," 65 *Tul. L. Rev.* 457 (1991), and toward decisions, such as *Smith v. Rapid Transit, Inc.*, 58 N.E.2d 754 (Mass. 1945), that refuse to permit a case to go to a jury on purely statistical evidence. In *Smith* the court held that it "was not enough" "that mathe-

matically the chances somewhat favor the proposition that a bus of the defendant caused the accident." *Id.* at 755.

Suppose, to consider a well-known hypothetical variant of *Smith*, that a person is hit by a bus, and it is known that 51 percent of the buses on the road where he was hit are owned by Bus Company *A* and 49 percent by Bus Company *B*. He sues *A* and asks for judgment on the basis of this statistic alone; he presents no other evidence. If the defendant also presents no evidence, should a jury be permitted to award judgment for the plaintiff? See, e.g., Gary L. Wells, "Naked Statistical Evidence of Liability: Is Subjective Probability Enough?" 62 *J. Personality & Soc. Psych.* 739 (1992). The law answers "no." Richard W. Wright, "Causation, Responsibility, Risk, Probability, Naked Statistics, and Proof: Pruning the Bramble Bush by Clarifying the Concepts," 73 *Ia. L. Rev.* 1001, 1050-51 (1988). But this is not because of doubt about the evidentiary value of statistical evidence. The true source of disquiet in the example, we believe, is the tacit assumption that the statistic concerning the ownership of the buses is the only evidence the plaintiff can obtain. *Howard v. Wal-Mart Stores, Inc.*, 160 F.3d 358, 360 (7th Cir. 1998). If it is his only evidence, the inference to be drawn is not that there is a 51 percent probability that it was a bus owned by *A* that hit him but that he either investigated and discovered that it was actually a bus owned by *B* (which might be judgment-proof and so not worth suing), or that he has simply not bothered to conduct an investigation. In either event he should lose, in the first case obviously and in the second because a court should not be required to expend any of its scarce resources of time and effort on a case until the plaintiff has conducted a sufficient search to indicate that an expenditure of public resources is reasonably likely to yield a social benefit.

But if both bus companies had been determined to be negligent, so that the only issue was which had hit the plaintiff, then in many states the 51/49 ratio of *A*'s to *B*'s buses would be enough for a judgment against *A*—indeed against *A* and *B*. See *Sindell v. Abbott Laboratories*, 607 P.2d 924 (Cal. 1980); *Summers v. Tice*, 199 P.2d 1 (Cal. 1948), *Krist v. Eli Lilly & Co.*, 897 F.2d 293, 300 (7th Cir. 1990). Or if the ratio of buses owned by *A* to those owned by *B* were much higher than 51/49, the case against allowing "naked" statistical evidence to carry the plaintiff's burden of production on the issue of liability (rather than only causation) would be weakened. The law recognizes this not only in the obvious cases of fingerprint and DNA evidence, the admissibility of which depends on the improbability that two different people would have the same fingerprint or DNA signature, *Branion v. Gramley*, *supra*, 855 F.2d at 1265, but also in the law's adoption of such presumptions as that a properly addressed, stamped, and mailed letter will reach the addressee. This is a purely statistical presumption because it is applied without regard to the particulars of the case beyond those required to satisfy the conditions of the presumption; and yet it can determine the outcome.

"All evidence is probabilistic—statistical evidence merely explicitly so," *Riordan v. Kempiners*, 831 F.2d 690, 698 (7th Cir. 1987); see also *Howard v. Wal-Mart Stores, Inc.*, *supra*, 160 F.3d at 360; *Milam v. State Farm Mutual Automobile Ins. Co.*, 972 F.2d 166, 170 (7th Cir. 1992); *United States v. Chaidez*, 919 F.2d 1193, 1200 (7th Cir. 1990), because nothing with which the law deals is metaphysically certain. Statistical evidence is merely probabilistic evidence coded in numbers rather than words. "Nothing about the nature of litigation in general, or the criminal process in particular, makes anathema of additional information, whether or not that knowledge has numbers attached. After

all, even eyewitnesses are testifying only to probabilities (though they obscure the methods by which they generate those probabilities)—often rather lower probabilities than statistical work insists on." *Branion v. Gramley, supra,* 855 F.2d at 1264. An eyewitness does not usurp the jury's function if he testifies that he is *positive* that he saw the defendant strike a match, and it would make no difference if he said that he is "99 percent" positive. The significant question would be the accuracy of the estimate. The actuary's one in 1.7 trillion estimate in this case probably was inaccurate, but not because it was a statistic. The issue of its accuracy has been waived, however, and in any event the error in its introduction was harmless; the other evidence against the defendant was overwhelming.

We wish to remark finally the apparent carelessness of the insurance companies, particularly the fire-insurance companies, in failing to pool information concerning fire claims. As a result of this failure, the insurers who insured Veysey against the last three fires were unaware of his previous claim or claims. This is a matter deserving of the industry's attention—and, with recent improvements in electronic storage and retrieval, beginning to receive it. Bruce R. Fox, "Technology: The New Weapon in the War on Insurance Fraud," 67 *Def. Couns. J.* 237, 241-42 (2000).

AFFIRMED.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*