UNITED STATES of America,
Appellee,

v.

Andre O. LOGAN, Defendant–
Appellant.

Docket No. 03–1290.

United States Court of Appeals,
Second Circuit.

Argued Dec. 3, 2004.

Decided Aug. 15, 2005.

James E. Neuman, New York, New York (Richard E. Mischel, Mischel, Neuman & Horn, P.C., New York, New York, of counsel), for Defendant–Appellant.

Robert P. Storch, Senior Litigation Counsel, Albany, New York (Glenn T. Suddaby, United States Attorney, Kevin P. Dooley, Assistant United States Attorney, Northern District of New York, Albany, New York, of counsel), for Appellee.

Before: WALKER, Chief Judge, CARDAMONE, and HALL, Circuit Judges.

CARDAMONE, Circuit Judge.

Early in the morning of August 11, 2001 several college students at the State University of New York at Cortland, New York (SUNY Cortland) broke into a fraternity house they had formerly occupied as student-tenants. Their mission was to burn the house down in retaliation for being evicted by the building's owner, who had since leased the house to a rival fraternity. They gained entrance by kicking in the back door and proceeded to spread gasoline through the building. They lit the gasoline with a match and fled, not realizing that one of the new tenants was asleep in an upstairs bedroom. Fortunately, the young student awoke in time to escape the ensuing fire without injury. The house, however, was destroyed.

This offense resulted in an indictment charging one of the perpetrators, Andre Logan (defendant or appellant), with arson and conspiracy to commit arson on property used in interstate commerce. After a trial before a jury in the United States District Court for the Northern District of New York (McAvoy, J.), Logan was convicted on the conspiracy count.

Logan challenges his conviction on two grounds. First, he contends that the admission of third-party testimony violated his Sixth Amendment right to confront witnesses against him. Second, he asserts that he was not properly prosecuted in federal court in the first place. Arson is, after all, a quintessential state crime. To make it a federal crime, Congress exercised its power under the Commerce Clause by providing in 18 U.S.C. § 844(i) that "[w]hoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire ... any building ... used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20

years." Interpreting this statute literally would make a federal crime of arson committed on any building used in a way that affects interstate commerce. The result would be that scarcely any such crime would escape federal prosecution. The Supreme Court laid this concern to rest when it limited the scope of the law to arson committed on any building used in interstate commerce for commercial purposes, including rental properties. We turn to a discussion of the background.

## BACKGROUND

### A. The Deltas and the Kappas

This case stems from a long-standing rivalry between two college fraternities— Delta Kappa Beta (Deltas) and Pi Kappa Phi (Kappas)—at SUNY Cortland. Defendant Andre Logan was a student at the college and a member of Delta Kappa Beta. The Deltas leased a fraternity house at 50 Tompkins Street in Cortland, New York, from its owner, William McDermott. The Deltas were not model tenants: they caused structural and interior damage to the house, failed to keep the premises clean, and did not pay the utility bills they incurred. The Deltas also failed to pay the rent agreed upon in the lease, and were responsible for the cancellation of the insurance on the building due to excessive claims. As a result of their conduct, in June 2001 McDermott demanded the Deltas vacate the premises. McDermott had meanwhile concluded a lease agreement with the Kappas the previous November.

Upon learning they were losing their fraternity house to the hated Kappas, several Deltas began threatening a variety of retributory acts against the Kappas and the house. A statement on the Deltas' alumni website threatened to burn the house down and commit acts of violence against the Kappas. Logan and other Del-

tas, including Dumas Gabbriellini and Leo Gordon, discussed several possible courses of action, including destroying the house with chain saws, throwing fecal matter on the walls, and burning down the house. Gabbriellini told other Deltas that if it came to burning the house, he and Gordon would establish an alibi by purchasing tickets to a New York Mets baseball game, having their tickets punched at the gate, leaving the game and returning to Cortland, burning down the house, and then returning to New York before anyone realized they were gone. Shortly after the Kappas signed the lease, Logan told a group of Kappas that they wouldn't have the house long because "[i]t would burn down."

The Kappas took occupancy of the house in July 2001. On August 3, 2001 Cortland police found a smashed Molotov cocktail in the street in front of Logan's home at 24 Clayton Avenue that appeared to have been thrown from Logan's house. Police also found puddles of lighter fluid on defendant's property, but Logan denied having any knowledge of the Molotov cocktail or the puddles. The next day, Logan and two other Deltas forcibly entered the fraternity house at four o'clock in the morning and woke the sleeping Kappas by marching through the house singing fraternity songs. Following this incident, the Kappas installed new locks, deadbolts, and bars on the doors.

On the evening of August 10, 2001 several Kappas left the fraternity house and went to a neighborhood bar called the Dark Horse. Only one Kappa, Matthew Rich, remained in the house, sleeping. Around one o'clock on the morning of August 11, Rich was awoken by a crash. He stayed in his room and listened as he heard footsteps moving throughout the house. The footsteps left the house a few minutes later and Rich opened his bed-

room door. He was confronted with flames and smoke. He escaped from the building and ran to the Dark Horse bar to find his friends. Rich summoned help from a police officer near the bar, but by the time he returned to the house it was engulfed in flames. Investigators subsequently determined that the fire had been deliberately set, caused by igniting a combustible liquid in several areas of the building.

### B. *Logan's Statements to Police*

Police interviewed Logan later that day. He admitted that he and the other Deltas had been upset about losing their fraternity house to the Kappas but denied any role in the arson. He insisted that on the night of August 10 he was visiting a friend. Logan stated that after having a late dinner at a Wendy's restaurant, he went to the Dark Horse bar sometime after one o'clock in the morning and first learned of the fire when he arrived at the bar. The next day Logan told his friend Joseph Hage that he had been involved in discussions with Gabbriellini and Gordon about destroying or mutilating the house, and that Gabbriellini and Gordon planned to use a Mets game as an alibi. Logan told police about his involvement with Gordon and Gabbriellini on August 15, 2001.

In the morning of August 16, shortly after making this statement, defendant told police that he had not been entirely forthcoming and wanted to tell the truth. Logan admitted that he knew Gordon and Gabbriellini were planning to set fire to the house and that they were planning to establish an alibi by having their tickets punched at a Mets game and then driving back to Cortland. He told the investigators that after going to the Wendy's restaurant he went to the fraternity house at about one o'clock in the morning and found Gordon and Gabbriellini there. He said

that Gabbriellini kicked in the back door and the three men entered the house. As they walked through the house, Gordon and Gabbriellini spread gasoline in several of the rooms. Gordon lit a match and ignited the gasoline, at which point the three left the house and Logan went to the Dark Horse bar. Logan added that he thought the house was empty and did not know Rich was inside, and that he never planned to participate in the arson.

The day after he took Logan's statement, Cortland Police Sergeant Paul Sandy traveled to Staten Island to interview Gordon at Gordon's parents' home. Gordon denied having any knowledge of the fire. He declared that he and Gabbriellini were at a Mets game on the night of August 10, and that after the game they went to a Staten Island bar called Joy's. When Sergeant Sandy informed Gordon that Logan had already given a statement implicating Gordon and that the police had reason to believe their story about attending the Mets game had been concocted as an alibi, Gordon's father demanded to speak to an attorney and ended the interview. Sergeant Sandy then traveled to Westchester County to interview Gabbriellini at his home. Gabbriellini gave the same story as Gordon, and said that Logan was lying because Logan was a "punk" whose "credibility wasn't worth anything."

### C. *Proceedings in the Trial Court*

Logan was tried in the Northern District of New York on charges of committing arson on property "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce" in violation of 18 U.S.C. § 844(i) and conspiracy to commit arson in violation of 18 U.S.C. § 844(n). At trial the government produced defendant's statements to the police; the evidence of the Molotov cocktail and lighter fluid found at his house; and

the testimony of several Kappas and Deltas regarding Logan's prior statements about burning or mutilating the house, threats of violence against the Kappas, and the alibi Gordon and Gabbriellini proposed to use in order to avoid detection. The government also called Sergeant Sandy to testify regarding the investigation and the alibi statements Gordon and Gabbriellini made when he questioned them. Defendant's counsel raised a hearsay objection to Sergeant Sandy's introduction of Gordon's and Gabbriellini's alibi statements but was overruled. Finally, the government called an employee of Joy's (the bar in Staten Island where Gordon and Gabbriellini claimed they went after the Mets game) who testified that Gordon and Gabbriellini were not old enough to enter that establishment and, in any event, she had no recollection of them being at the bar on the night of the fire.

The jury acquitted Logan on the substantive arson count but convicted him of conspiracy to commit arson. Defendant then brought a timely motion for judgment as a matter of law on grounds that the verdicts were inconsistent and 18 U.S.C. § 844(n) was unconstitutional as applied because there was not a sufficient link between the fraternity house and interstate commerce. Judge McAvoy denied this motion in a decision and order dated April 16, 2003. The district court sentenced defendant to 60 months imprisonment, the statutory minimum, and three years supervised release. *See* 18 U.S.C. § 844(i) (2000). Logan then took this appeal.

### DISCUSSION

Appellant raises two issues on appeal. First, he contends the district court erred in allowing the government to introduce Gordon's and Gabbriellini's alibi statements through Sergeant Sandy's third-

party testimony. According to Logan, use of third-party testimony to introduce these statements violated his Sixth Amendment right to confront witnesses testifying against him. Second, he maintains that 18 U.S.C. § 844(n), under which he was convicted of conspiracy to commit arson, is unconstitutional as applied. He asserts that conspiring to burn a rented house that is used as a private dwelling does not have a substantial effect on interstate commerce and thus does not support a federal cause of action.

## I The Alleged Confrontation Clause Violation

### A. *Standard of Review*

Logan did not raise a Sixth Amendment objection to Sergeant Sandy's introduction of Gordon's and Gabbriellini's statements at trial and therefore did not properly preserve the issue for appellate review. Defendant admits as much in his brief, but insists the decision to admit the statements qualifies as plain error. *See* Fed.R.Crim.P. 52(b).

When a defendant does not object to a legal ruling at trial, an appellate court may only review that ruling if it was in error, the error was plain, it affects substantial rights, and it has a serious effect on " 'the fairness, integrity, or public reputation of judicial proceedings.' " *Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (*quoting United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)); *United States v. Rossomando*, 144 F.3d 197, 200 (2d Cir.1998). We consider an error plain when the correct rule was "clear under current law," and an effect on substantial rights "normally requires a showing of prejudice." *United States v. Viola*, 35 F.3d 37, 41 (2d Cir.1994).

The Sixth Amendment guarantees a defendant the right to be confronted by the witnesses against him, and testimonial statements may be introduced by a third-party witness only when the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant regarding the statement. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *United States v. McClain*, 377 F.3d 219, 221 (2d Cir.2004). Unsworn statements elicited by police officers in the course of an interrogation are considered testimonial for Confrontation Clause purposes. *Crawford*, 541 U.S. at 52–53, 124 S.Ct. 1354. Because the government did not call either Gordon or Gabbriellini to testify, but instead had Sergeant Sandy testify to the alibi statements they made when he interviewed them, defendant asserts a violation of his Sixth Amendment right to confront Gordon and Gabbriellini.

### B. *The Statements by Gordon and Gabbriellini were not Offered to Prove the Truth of the Matter Asserted*

"The [Confrontation] Clause … does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n. 9, 124 S.Ct. 1354 (*citing Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985)). In *Street*, the defendant in a murder case testified that his confession had been coerced by the county sheriff, who allegedly forced Street to give the same statement Street's co-conspirator Peele had already given. *Street*, 471 U.S. at 411, 105 S.Ct. 2078. The state called the sheriff to testify and had him read aloud the contents of Peele's statement to demonstrate the differences between that statement and Street's statement and to rebut Street's assertion that his confession was coerced. *Id.* at 411–12, 105 S.Ct. 2078.

The trial judge cautioned the jury that Peele's statement was admissible solely for rebuttal purposes and not to prove the truth of Peele's confession. *Id.* at 412, 105 S.Ct. 2078. The Supreme Court held "[t]he *nonhearsay* aspect of Peele's confession—not to prove what happened at the murder scene but to prove what happened when respondent [Street] confessed—raises no Confrontation Clause concerns." *Id.* at 414, 105 S.Ct. 2078.

We think the Confrontation Clause violation alleged by Logan is no different than the alleged violation in *Street.* Gordon's and Gabbriellini's statements were not offered to prove they had been at a Mets game on the night of the fire, but rather were offered to corroborate Logan's own statement, and the testimony of other witnesses at trial, that Gordon and Gabbriellini were planning to use the Mets game as an alibi. The fact that Logan was aware of this alibi, and that Gordon and Gabbriellini actually used it, was evidence of a conspiracy among Gordon, Gabbriellini, and Logan. As in *Street,* the mere fact that the content of Gordon's and Gabbriellini's statements cast doubt on Logan's innocence does not bring those statements within the ambit of Sixth Amendment protection under *Crawford.* Since Gordon's and Gabbriellini's statements were not offered to prove the truth of the matter asserted, introducing them through Sergeant Sandy's third-party testimony did not violate the Confrontation Clause.

 We are not persuaded by the government's alternative contention that Gordon's and Gabbriellini's statements to Sergeant Sandy failed to present a Confrontation Clause issue because they were not testimonial within the meaning of *Crawford.* Under *Crawford,* "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does [*Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)], and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." 541 U.S. at 68, 124 S.Ct. 1354; *see United States v. Saget,* 377 F.3d 223, 227 (2d Cir.2004) (assuming for purposes of the opinion, that "*Crawford* leaves the *Roberts* approach untouched with respect to nontestimonial statements, ... [and thus] their admission d[oes] not violate the Confrontation Clause so long as the statements fall within a firmly rooted hearsay exception or demonstrate particularized guarantees of trustworthiness," but noting there is some doubt about whether there can be limits on the use of non-testimonial hearsay at all) (*citing Roberts,* 448 U.S. at 66, 100 S.Ct. 2531). In general, statements of co-conspirators in furtherance of a conspiracy are non-testimonial. *See Crawford,* 541 U.S. at 56, 124 S.Ct. 1354 (noting that most hearsay exceptions "covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy").

Although Gordon's and Gabbriellini's alibi statements to Sergeant Sandy were in furtherance of the conspiracy, we believe they were also testimonial. Although the *Crawford* majority declined to offer a precise definition of testimony, *see id.* at 68, 100 S.Ct. 2531, it provided examples—prior testimony in court or before a grand jury, or statements given in a police interrogation, *see id.*—from which we have concluded that testimonial statements "involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings." *Saget,* 377 F.3d at 228. Here, Gordon and Gabbriellini made

their false alibi statements in the course of a police interrogation, and thus should reasonably have expected that their statements might be used in future judicial proceedings. Given *Crawford*'s explicit instruction that "[s]tatements taken by police officers in the course of interrogations are ... testimonial under even a narrow standard," *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354, the government's contention that these statements were non-testimonial is unconvincing.

### C. The District Court's Decision to Admit the Statements did not Prejudice Logan

■ Since Gordon's and Gabbriellini's statements were not offered to prove the truth of the matter asserted, the district court properly allowed their admission through third-party testimony. Even were we inclined to accept Logan's Confrontation Clause argument, we would still find no plain error because Logan cannot demonstrate any prejudice from the receipt of this testimony.

■ Under plain error review, the defendant bears the burden of establishing prejudice. *Olano*, 507 U.S. at 734–35, 113 S.Ct. 1770. Here, we have little trouble concluding that the jury had an ample basis for finding Logan guilty of conspiracy to commit arson even without Gordon's and Gabbriellini's statements. At most, those statements simply corroborated Logan's own statement, and the testimony of other witnesses at trial, that Gordon and Gabbriellini intended to use the Mets game as a false alibi. Far more crucial to Logan's conviction was his unrebutted confession and the testimony of Delta and Kappa witnesses establishing that Logan knew of the plot to burn the house down, participated in planning conversations with Gordon and Gabbriellini, and made public statements threatening to carry out those plans. Moreover, the government produced evidence that a Molotov cocktail had been thrown from Logan's house a few days before the arson and that there were pools of lighter fluid on Logan's property. Hence, defendant is unable to demonstrate that without the challenged statements, the result at trial would have been any different—that is, that he suffered prejudice as a result of the admission of these statements.

Consequently, the decision to admit into evidence Sergeant Sandy's testimony regarding the false alibi statements made by Gordon and Gabbriellini was not plain error. It follows that we must reject defendant's Confrontation Clause challenge.

### II The Link Between Interstate Commerce and 18 U.S.C. § 844(n)

■ Logan further asserts that 18 U.S.C. § 844(n), which criminalizes conspiracy to commit arson on property that is used in interstate commerce or in any activity affecting interstate commerce, is unconstitutional as applied because the government failed to prove that a rented fraternity house used solely as a private residence has a substantial effect on interstate commerce as required by the Supreme Court. *See, e.g., Gonzales v. Raich*, —— U.S. ——, 125 S.Ct. 2195, 2205, 162 L.Ed.2d 1 (2005); *United States v. Morrison*, 529 U.S. 598, 609, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); *United States v. Lopez*, 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

■ The decisional law is to the contrary. The threshold inquiry under 18 U.S.C. § 844 is what is the function of the building that is the subject of the offense, and when that is ascertained, the court then decides whether such function is one affecting interstate commerce. *See Jones v. United States*, 529 U.S. 848, 854, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000). The Supreme Court instructs that although the

statute covers any type of building, such building must be used in commerce or in an activity affecting commerce. *Id.* at 855, 120 S.Ct. 1904. This reflects the recognized distinction between legislation limited to activities *in* commerce and legislation invoking Congress' power over activities that *affect* commerce. *See id.* at 855–56, 120 S.Ct. 1904 (*citing Russell v. United States*, 471 U.S. 858, 859–60 & n. 4, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985)). For purposes of the statute, "use" means "active employment." *Id.*

In *Russell,* the Supreme Court recognized that rental of a local apartment is part of a vast commercial market in rental properties, and "[t]he congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class." 471 U.S. at 862, 105 S.Ct. 2455. *Russell* holds that where property is being rented to tenants at the time of an arson, it is being used in an "activity affecting commerce" within the meaning of 18 U.S.C. § 844(i). *Id.*

Logan nonetheless insists that the holding in *Russell* does not govern his case. He reasons that *Russell* was decided 20 years ago and the Supreme Court has since issued decisions that limit statutes such as 18 U.S.C. § 844 by requiring that an activity *substantially* affect interstate commerce in order to fall within congressional power under the Commerce Clause. *See Morrison*, 529 U.S. at 609, 120 S.Ct. 1740; *Lopez*, 514 U.S. at 558–59, 115 S.Ct. 1624. Even though Logan concedes *Russell* has not been overruled, he believes § 844 can no longer be constitutionally applied to the arson of a building that is rented for residential purposes, at least not without some other connection to interstate commerce.

This argument fails for two reasons. First, the Supreme Court cited *Russell* with approval in *Jones,* which was decided after *Morrison* and *Lopez. See Jones,* 529 U.S. at 853–54, 856, 120 S.Ct. 1904. In reversing Jones' arson conviction the Court ruled that an *owner-occupied* residence *not* used for commercial purposes does not qualify as property used in commerce or commerce-affecting activity and arson of such a residence is therefore not subject to federal prosecution under § 844(i). *Id.* at 856–57, 120 S.Ct. 1904. The Court expressly distinguished such a situation from that in *Russell,* placing great reliance on the fact that *Russell,* like the instant case, "involved the arson of property rented out by its owner," an activity that " 'unquestionably' " falls within the scope of 18 U.S.C. § 844. *Jones,* 529 U.S. at 856, 120 S.Ct. 1904 (*quoting Russell,* 471 U.S. at 862, 105 S.Ct. 2455). As the Seventh Circuit recently stated in rejecting the very same argument Logan makes here, "[b]etween the two cases [*Russell* and *Jones* ] the Supreme Court's conception of interstate commerce narrowed, but *Jones* reaffirms *Russell,* ... and we are given no reason to doubt the continued authority of the earlier case." *United States v. Veysey,* 334 F.3d 600, 603 (7th Cir.2003). Moreover, we note the Supreme Court recently reaffirmed "Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce," *Raich,* 125 S.Ct. at 2205, the same basis on which *Russell* upheld federal regulation of local properties involved in the nationwide "class of activities that constitute the rental market for real estate." *Russell,* 471 U.S. at 862, 105 S.Ct. 2455.

Second, even if we had reason to believe that *Russell* 's holding is questionable in light of *Morrison* and *Lopez,* it has not been expressly overruled by the Supreme Court. Courts of Appeals are therefore obligated to follow *Russell* until the Supreme Court itself sees fit to reconsider that decision. We are well aware of the

Supreme Court's admonition that if a Supreme Court precedent has direct application in a case before us, but rests on reasons rejected in another line of Supreme Court cases, we should follow the directly controlling case and leave to the Supreme Court " 'the prerogative of overruling its own decisions.' " *Agostini v. Felton,* 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (*quoting Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)). We therefore decline Logan's invitation to reconsider *Russell* in light of *Morrison* and *Lopez.* Accordingly, because *Russell* controls this appeal, we reject defendant's challenge to his conviction on Commerce Clause grounds.

## CONCLUSION

We have reviewed defendant's remaining contentions and find them to be without merit. For the foregoing reasons, the order of the district court denying Logan's motion for judgment as a matter of law notwithstanding the verdict is affirmed.