In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 06-1741

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MARC E. THOMPSON,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 944—**Suzanne B. Conlon**, *Judge*.

ARGUED OCTOBER 24, 2007—DECIDED APRIL 25, 2008

Before FLAUM, MANION, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*.  At one time, Marc Thompson owned a seat on the Chicago Board of Trade and earned over $1 million a year. He is now in prison after a jury found him guilty of setting his house on fire in an attempt to collect on an insurance policy. In an even more disturbing finding, the district court concluded that he deliberately killed his own mother in the fire while trying to make it appear that she had committed suicide. We find that sufficient evidence supported the jury's conclusion that Thompson set the fire, so we affirm his convictions. We

also find no error in the district court's conclusion that Thompson committed premeditated murder, as the Sixth Amendment does not require that a jury find that a defendant committed murder before a district court can apply the Sentencing Guidelines' murder cross-reference. In addition, imposing consecutive statutory maximum sentences for all counts of conviction was not erroneous because the advisory Guidelines range was life imprisonment, and the district court imposed an equivalent sentence of 190 years' imprisonment. Therefore, Thompson's sentence is affirmed as well.

## I.  BACKGROUND

For a time, Marc Thompson seemed to have it all. He held an undergraduate degree from Berkeley and had performed graduate work at Stanford. He became a successful broker. He at one point made over $1 million a year. He lived in a home overlooking Lake Michigan with his wife and three children. After an expensive divorce, however, his finances began to fall apart. He lost his biggest client and then his job, and he began to borrow money from business associates and friends, often in large amounts. Several loaned him over $100,000.

On September 15, 2000, Thompson filed an insurance claim for about $50,000, alleging that burglars broke into his home on Paulina Avenue in Chicago and stole a computer and other belongings. Chubb Insurance Company promptly paid the claim. In June of the next year, Thompson moved his then eighty-nine-year-old mother, Carmen Thompson, from California to live with him in Chicago. He arranged for her home to be sold, placed the proceeds into her bank account, and then spent the major-

ity of the proceeds. In December of 2001, Thompson raised his Chubb homeowner's insurance policy from $275,000 to $350,000.

The next year, Thompson told his housekeeper that his mother had said she wanted to burn the house down. Then, on August 8, 2002, Thompson brought his mother to the hospital after she sustained a burn injury on her shoulder. He first told caregivers that she had fallen on the stove after he had left the room. Later that night, though, he told hospital employees that she was injured after he left her alone in the house. The hospital treated and released Carmen, but not before calling an elder abuse hotline, and Thompson brought her back to his home.

Three days later, Thompson's house caught fire. Neighbors saw Thompson and two of his sons leave their home around 7:00 p.m. that evening. Thompson told investigators that he left the house around 6:15 p.m., made one stop, and then went to see a 7:05 p.m. movie with his children at a theater located at 600 N. Michigan Avenue in Chicago. Travel time would have been about fifteen minutes from the house directly to the theater. The parties stipulated at trial that Thompson's youngest son remembered arriving at the movie theater about 8 minutes and 30 seconds into the movie, making arrival time (after accounting for previews) into the theater 7:29:30 p.m.

Back near Thompson's home, neighbors saw smoke coming from the house at about 7:10 p.m. and called 911. Firefighters quickly extinguished the fire but found Thompson's mother in the basement, dead of smoke inhalation, about four feet from the fire's origin. The area underneath her body was untouched by the fire. Chicago Police Department detectives subsequently questioned Thompson, and he told them his mother sometimes acted

in a psychotic manner, was taking medications, had previously burned herself, and had talked about committing suicide in the past. The detectives quickly ended their investigation, and the Cook County Medical Examiner declared Carmen's death a suicide.

At the time, however, the police and Medical Examiner were unaware of the neighbors' observations regarding the night of the fire, Thompson's financial condition, the fact that steep stairs led to the basement, and that Carmen had physical disabilities limiting her mobility. In addition, analysis showed that at the time of her death, Carmen had alcohol, Nordiazepam (from the Valium family), and Risperdal, an anti-psychotic drug, in her system. Valium had been prescribed to Thompson but not to his mother, and Thompson had obtained the Risperdal prescription for his mother from a physician who had not examined her. Also, a codicil to Carmen's will dated August 4, 2002—a week before the fire—stated she did not want an autopsy performed in the event of her death and also that she wished to be cremated immediately, noting in bold that this marked a change from her most recent will.

Fire Marshal Carmelita Wiley-Earls led the Chicago Fire Department's investigation into the fire's cause. She arrived while firefighters were still extinguishing the blaze and spent six hours on the scene. She ultimately concluded that the fire had been caused by the ignition of a flammable liquid that had been poured or splashed in the basement of the house.

Thompson called his insurance company the night of the fire. (He telephoned his sister the following morning to inform her of their mother's death.) His claims for content loss totaled $756,766, but his policy only provided for "replacement value"—the amount it would take to replace

the contents and to replace the damaged house. Because the house was not a total loss and could be repaired, the insurance company would only pay a reduced amount. As a result, Thompson chose to sell the property, and the insurance company ultimately paid $269,000 for damage to the house. Thompson also claimed that property had been stolen from his fire-damaged house, and the insurance company paid over $350,000 for lost and stolen items.

Four days after the fire, Thompson opened a bank account in Chicago. In November and December of 2002, he transferred $400,000 from that account to one in the Netherland Antilles held in the name of Toscana Consulting Services, Ltd., a shell company he had set up in 2000 to hide money from his ex-wife. He filed for bankruptcy in May of 2003. At trial, he admitted that he had committed bankruptcy fraud when he made false statements on his bankruptcy application and used his offshore account to conceal assets from creditors.

A jury rendered a verdict of guilty against Thompson on all nineteen counts with which he had been charged, including wire fraud, use of fire to commit a felony, bankruptcy fraud, and money laundering. At sentencing, the district court applied the first degree murder cross-reference and sentenced him to the statutory maximum on all counts. The resulting sentence was 190 years' imprisonment. Thompson now appeals his conviction and sentence.

## II. ANALYSIS

A. Sufficient Evidence Supported the Verdict.

Thompson raises only one challenge to his convictions. He maintains there was insufficient evidence for the jury to

convict him of wire fraud, use of fire to commit a felony, and one count of engaging in a monetary transaction using criminally derived funds. An argument that insufficient evidence supported a jury verdict is difficult to win. In our review of such a challenge, we "view all the evidence and draw all reasonable inferences in the light most favorable to the prosecution and uphold the verdict if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Gallardo*, 497 F.3d 727, 737 (7th Cir. 2007) (citations omitted).

Thompson's argument focuses on the testimony of the government's fire cause and origin expert, Carmelita Wiley-Earls from the Chicago Fire Department. Wiley-Earls concluded that the fire at Thompson's home was incendiary in origin, fueled by a liquid that had been poured or splashed in the home's basement and then ignited with an unknown open flame. Thompson maintains that Wiley-Earls's testimony was so conclusory that it did not provide enough support for a rational jury to find beyond a reasonable doubt that the fire was caused by arson.

As an initial matter, the testimony from Wiley-Earls was but one part of the government's case of trial, which included plenty of other evidence from which a rational jury could find that Thompson caused the fire. *See United States v. Lundy*, 809 F.2d 392, 397 (7th Cir. 1987) (finding sufficient evidence to sustain arson conviction after considering "evidence as a whole indicating, *inter alia*, motive, plan, preparation, opportunity and absence of accident"). Thompson testified in his own defense and denied causing the fire, but the jurors certainly had reason to disbelieve him. For one, his account of the night of the fire did not match up with that of his neighbors. Neighbors

testified that they saw Thompson and his children leave their home around 7:00 p.m., observed smoke coming from the house around 7:10 p.m., and then called 911. Thompson, on the other hand, said that he left his home around 6:15 p.m. on his way to see a movie with his children. His testimony at trial also contradicted the account he had given an investigator a few days after the fire. At trial, he testified that he stopped at a gas station to get cigarettes on the way to the movie; Thompson had told the investigator that his stop was at a Walgreens to pick up a newspaper. The jurors also heard him admit that he had committed bankruptcy fraud when he lied on his bankruptcy application and when he wired money to an offshore bank account to conceal assets from creditors. He also admitted to lying under oath in his divorce proceedings and to the bankruptcy trustee. Rational jurors could easily have believed that he was not telling the truth in this trial.

At the time of the fire, Thompson was admittedly in financial trouble. He was no longer earning the six or seven figure income he once had. Instead, the jurors heard that an expensive divorce and the loss of his job meant that he was facing mounting financial difficulties. The jurors also heard that he had increased his homeowner's insurance policy eight months before the fire, and that the same insurance company had quickly paid his claim when he said his home had been burglarized two years earlier. Moreover, his mother's will contained a recently-added codicil stating she did not want an autopsy, even though the attorney who drafted the will said he knew nothing about the codicil. The jurors could have also believed that the burn on his mother's shoulder three days before the fire resulted from a failed attempt to stage her as the cause of a fire to his home that night.

As to Wiley-Earls, she testified at trial without any objection from the defense. She was a lieutenant in the Chicago Fire Department at the time of the trial and had worked in the Department for nearly fifteen years. For over five of those years, she served as a fire marshal determining the cause and origin of fires, a role for which she had received specific in-class and on-the-job training. On August 11, 2002, she was assigned to investigate the fire at Thompson's home.

Wiley-Earls arrived at the residence while firefighters were still shooting water into the home. She began her investigation by observing the exterior of the home and interviewing the incident commander and firefighters. Inside the home, she found only smoke damage on the second floor, and the first floor's fire damage was limited to a plumbing wall that came from the basement.

The basement itself, however, was a different story. There, Wiley-Earls found "unusual" low burning at the point where a wall met the floor. She explained that in the absence of an accelerant, one would expect a "V" pattern of fire damage to form from the point of origin. Here, on the other hand, she found uniform low-burning that was not normal in a typical fire. Because one wall had the most concentrated charring and damage, Wiley-Earls determined that the fire had originated there. Carmen Thompson's body was found face-down, a few feet away. Two cans of flammable liquid, each containing a residual amount of liquid and vapors, were also found nearby, although Wiley-Earls acknowledged that the cans might have moved during the efforts to put out the fire.

Wiley-Earls's investigation included an attempt to locate a heat source. She eliminated a light switch near the area of origin because it was "in excellent shape," the wiring

inside the wall was "in great shape," and the breaker supplying the switch did not show any problems. She also ruled out the furnace's pilot light because there was no damage whatsoever to the furnace. She testified that she looked for any other possible accidental causes and found none.

Wiley-Earls ultimately concluded that a flammable liquid poured or splashed in the area of origin, ignited with an open flame, caused the fire. She had eliminated all natural causes. Firefighters and Wiley-Earls had both smelled a flammable liquid at the scene. And the uniform burning on the baseboard indicated to her that an ignitable liquid had been used.

Thompson, however, maintains that Wiley-Earls's conclusion of an incendiary fire started by an accelerant was unsupported. He contends that although a liquid accelerant poured on a floor can create floor-level burning, floor-level burning can also have other causes. For example, he says, the heat from a fire in an enclosed area can cause materials to fall to the ground and burn, causing floor-level damage. *See* National Fire Protection Association, *Guide for Fire and Explosion Investigations* (2004) at 6.16.5.1-5.2. As a result, Thompson maintains that Wiley-Earls should have obtained test results from debris samples before concluding that an accelerant had caused the fire. He stresses that no test results supported her conclusion and points out that the National Fire Protection Association (NFPA)'s *Guide for Fire and Explosion Investigations* recommends testing to confirm the presence of accelerants. *See id.* at 6.16.2.4.3 ("If the presence of an ignitable liquid is suspected, samples should be collected and laboratory tests should be used to verify their presence.").

As it turns out, some testing was done, and the government had produced to the defense a report from the

Chicago Police Department that stated:

> EVIDENCE:
>
> 10014010 (603). One (1) pint fire debris can. Recovered by Det. L. Gates #20083. Sent to Crime Lab. for analysis.
>
> Crime Lab analysis is negative for flammable liquids.

The government did not introduce the negative test results at trial. During cross examination of Wiley-Earls, Thompson's counsel brought out the fact that Wiley-Earls never received the results of the materials she had submitted for testing. The procedures in the NFPA's *Guide* that Thompson points to for the first time on appeal and the fact that an analysis for flammable liquids (it is unclear exactly what was tested) had come back negative were also the potential subjects of cross examination at trial. They were not raised.

But notably, on this challenge to the sufficiency of the evidence supporting the jury's verdict, the lack of confirming test results was not necessary for the government to prove that Thompson intentionally caused the fire in this case. *Cf. United States v. Ziperstein*, 601 F.2d 281, 291 (7th Cir. 1979) (principles of *Brady v. Maryland*, 373 U.S. 83 (1963) not implicated by government's failure to introduce at trial documents favorable to defendant so long as documents made available to defendant). Thompson's primary defense at trial was that his mother had burned down the home, and negative test results would not have supported that theory. Moreover, "arson, like most other crimes, may be proved by the use of circumstantial evidence." *United States v. Kamel*, 965 F.2d 484, 488 (7th Cir. 1992). And we will reverse a jury's verdict on a sufficiency of the evidence challenge "only if no rational trier of fact

could have found him guilty of the charges beyond a reasonable doubt." *United States v. DeSilva*, 505 F.3d 711, 715 (7th Cir. 2007). In this case, as we detailed, there was more than sufficient evidence for a rational jury to find that Marc Thompson caused the fire at his home on August 11, 2002. We will not disturb the jury's verdict.[1]

B.  The Challenged Guideline Calculations Were Appropriate.

Thompson received a sentence of 190 years' imprisonment. The district court imposed this sentence after concluding that Thompson had committed premeditated murder, making the first degree murder cross-reference, U.S.S.G. § 2A1.1, applicable. The indictment did not charge Thompson with the crime of murder, and the jury was not asked whether Thompson had committed murder. As a

---

[1] We also reject Thompson's argument that the government's failure to introduce the complete insurance policy means insufficient evidence supports the convictions. At trial, Thompson did not object to the introduction of only part of the policy, nor did he seek to introduce the full text himself. Thompson maintains on appeal that he could not have staged his mother's suicide because his insurance policy would not pay him if his mother took her own life. Even if this interpretation of the policy is true, what matters is Thompson's belief that he would be paid, not whether he was correct in that belief. The evidence suggested that Thompson believed he would be paid. In a previous claim to the same insurance company based on an alleged burglary, Thompson received prompt payment without investigation. In addition, Thompson requested a copy of the policy after the fire, suggesting that he was not familiar with all its provisions.

result, Thompson maintains that his sentence violates
*Apprendi v. New Jersey*, 530 U.S. 466 (U.S. 2000), and his
Sixth Amendment right to a trial by jury.

On appeal, we can review whether the district court
correctly calculated the advisory range under the United
States Sentencing Guidelines, but after that, we must give
deference to the district court's choice of sentence. *Gall v.
United States*, 128 S. Ct. 586, 591 (2007). Here, it is clear that
the district court believed Thompson committed premedi-
tated murder and sought to impose as long a sentence as
possible. We find no legal error in its decision to do so.

Turning to Thompson's specific arguments, he first
maintains that for the murder cross-reference to apply, a
jury needed to find beyond a reasonable doubt that he
committed murder. In response, the government begins by
contending that the jury's verdict of guilty necessarily
means that it found that Thompson had deliberately killed
his mother. Indeed, the district court thought so, stating at
sentencing:

> Particularly relevant here is the jury's determina-
> tion that [the defendant] engaged in arson in
> burning that house and that he engaged in a
> scheme to defraud CHUBB Insurance by conceal-
> ing the fact that he burned the building and then
> staged the whole event to look as if his mother was
> committing suicide.

> The death of Carmen Thompson was part and
> parcel, it was an essential component, of the gov-
> ernment's case, it was the way the government
> presented the case to jury, and it was the way the
> case was defended.

And paragraph five of Count One in the indictment had alleged in part:

> It was further part of the scheme that the defendant intentionally staged the fire at his residence to appear to be an arson committed by his mother, Carmen S. Thompson, then 90 years old. As a direct result of the defendant's intentional acts, his mother died of smoke inhalation in the basement of the Paulina Residence.

As Thompson points out, however, the jury was told that it needed to find only *one* of the acts charged in the wire fraud scheme in Count One to convict on that count, and not all the charged acts referenced Carmen's death. The jury also returned only a general verdict, so it did not explicitly find that Thompson had committed the premeditated murder of his mother.

In any event, the law did not require the jury to find beyond a reasonable doubt that Thompson had committed the premeditated murder of his mother for the murder cross-reference to apply. In saying so, we are not unmindful that it might seem odd to see that this case has been prosecuted as a wire fraud case in federal court, not as a murder case in state court. A state court murder prosecution would not have raised the Sixth Amendment concerns Thompson brings here; it is unclear why such a prosecution was not brought. Our precedent, however, forecloses Thompson's challenges to his sentence. First, we have made clear that even after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), judges may make findings at sentencing using a preponderance of the evidence standard. *See, e.g., McReynolds v. United States*, 397 F.3d 479, 481 (7th Cir. 2005) ("[D]ecisions about sentencing factors will continue to be made by judges, on the prepon-

derance of the evidence, an approach that comports with the sixth amendment so long as the guideline system has some flexibility in application."). We also note that in this case, the district court judge went further, finding that "whether one applies the standard of proof beyond a reasonable doubt or using the applicable standard of evidence the government has established [the defendant's] offense behavior includes the premeditated murder of his mother."

We have also already rejected the argument that enhancing a sentence based on an uncharged murder violates *Apprendi*. Under *Apprendi*, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum" must be presented to a jury and proven beyond a reasonable doubt. 530 U.S. at 490. In *United States v. Veysey*, 334 F.3d 600 (7th Cir. 2003), the defendant was convicted of fifteen counts of mail fraud and one count each of arson, wire fraud, and using fire to commit mail fraud. In determining the Guidelines range, the district court applied the first degree murder enhancement, even though murder had not been charged. The total statutory maxima of the counts of conviction was 110 years. We held that the defendant's receipt of that sentence did not violate *Apprendi*. *Veysey*, 334 F.3d at 602. Here, the total statutory maxima of the counts of conviction—the relevant inquiry under *Apprendi*—was 190 years, the same sentence he received. There was no *Apprendi* violation. *See also United States v. Santiago*, 495 F.3d 820, 822-24 (7th Cir. 2007) (rejecting Sixth Amendment challenge to district court's finding at sentencing that the defendant had committed an uncharged murder, which resulted in an increased Guidelines range); *United States v. Reuter*, 463 F.3d 792, 793 (7th Cir. 2006) (same).

Next, the district court's decision to impose consecutive maximum sentences on each count of conviction was not erroneous. Thompson maintains that only the wire fraud, arson, and one money laundering charge can be "stacked" because they are the only charges applicable to the relevant conduct of murder. We disagree. The concept of relevant conduct mattered in the initial assessment of whether the murder enhancement was proper under the Guidelines. *See* U.S.S.G. § 1B1.3. But "relevant conduct" does not prevent a court from imposing consecutive statutory maximum sentences for all counts of conviction. Instead, U.S.S.G. § 5G1.2(d) states:

> If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.

Again, *Veysey* is instructive. There, the highest statutory maximum for any individual count was twenty years. We upheld the district court's decision to impose consecutive statutory maximum sentences for a resulting sentence of 110 years' imprisonment, and we explained:

> The federal sentencing guidelines direct the judge, when there are multiple counts of conviction, to impose maximum and consecutive sentences to the extent necessary to make the total punishment equal in severity to what the guidelines would require were it not for the statutory maxima. Because Veysey's remarkable spree included murder, as well as attempted murder, multiple arsons, and multiple frauds, the guideline sentence would have been life. The judge exceeded no

statutory maximum in producing an equivalent sentence [of 110 years' imprisonment].

*Veysey*, 334 F.3d at 602 (internal citations omitted). In this case as well, the advisory Guidelines range was life imprisonment. The district court thought a life sentence was warranted, and it did not err when it imposed consecutive maximum sentences on each count of conviction to reach an equivalent sentence.

Finally, Thompson maintains that his Fifth Amendment right to due process was violated because the Guidelines, although advisory now, were mandatory when the charged offenses took place. We rejected a similar argument in *United States v. Jamison*, 416 F.3d 538, 539-40 (7th Cir. 2005), and we decline to revisit it here.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Thompson's conviction and sentence.