Orlando v. Nassau Cty. Dist. Atty's Off.

# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2017

No. 17-2390

MARK ORLANDO,
*Petitioner-Appellant,*

*v.*

NASSAU COUNTY DISTRICT ATTORNEY'S OFFICE,
*Respondent-Appellee.*[1][2]

---

[1] The Clerk of Court is directed to amend the caption as set forth above.

[2] The Nassau County District Attorney's Office has proceeded as respondent in this case, without objection. However, "§ 2254 petitioners challenging present physical custody [should] name either the warden or the chief state penal officer as a respondent." *Rumsfeld v. Padilla*, 542 U.S. 426, 450 n.18 (2004) (emphasis removed) (citing Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts; Advisory Committee's Note on Rule 2(a), 28 U.S.C., pp. 469-470 (adopted in 1976) (stating that this is the rule in the "usual case")). As such, the district court is directed on remand (and prior to issuing the writ) to substitute as respondent the warden of Orlando's place of incarceration.

Appeal from the United States District Court
for the Eastern District of New York.
No. 11-cv-3992 — Edward R. Korman, *Judge.*

ARGUED: MAY 30, 2018
DECIDED: FEBRUARY 11, 2019

Before: JACOBS and DRONEY, *Circuit Judges*, and SHEA, *District Judge.**

Appeal from a judgment of the United States District Court for the Eastern District of New York (Korman, *J.*) denying Petitioner-Appellant Mark Orlando's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Orlando was convicted of murder in the second degree in the Supreme Court of New York, Nassau County. During the homicide investigation, police detectives separately interrogated Orlando and his alleged accomplice. The latter confessed that he had shot the victim, but that Orlando had hired him to commit the murder. At Orlando's trial, a detective was permitted to testify that the accomplice had stated that Orlando paid him to commit the murder. The accomplice, who was tried separately, did not testify at Orlando's trial. Orlando contends that notwithstanding a limiting instruction by the trial court, the detective's testimony violated the Confrontation Clause of the Sixth Amendment and that the state court's ruling to the contrary constituted an objectively unreasonable application of clearly established federal law. We

---

* Judge Michael P. Shea, United States District Court for the District of Connecticut, sitting by designation.

agree. Accordingly, we **REVERSE** the district court's denial of Orlando's petition, and **REMAND** the cause to the district court with instructions to grant the petition for a writ of habeas corpus.

Judge SHEA dissents in a separate opinion.

---

JANE SIMKIN SMITH, Millbrook, NY, *for Petitioner-Appellant.*

SARAH S. RABINOWITZ, ASSISTANT DISTRICT ATTORNEY (Tammy J. Smiley, Assistant District Attorney, *on the brief*), *for* Madeline Singas, Nassau County District Attorney, Mineola, New York, *for Respondent-Appellee.*

DRONEY, *Circuit Judge*:

On Friday night, December 3, 2004, at approximately 8:45 p.m., in response to a 911 call, police officers from the Long Beach, New York, police department found the body of Bobby Calabrese.[3] Calabrese was lying face down next to his Infiniti automobile, which was still running. He had been shot in the back of his head at close

---

[3] Long Beach is in Nassau County, New York, on Long Island.

3

range three times with a .44 caliber revolver. Calabrese had been a "runner" for an illegal sports betting organization.

The following Thursday, Nassau County police detectives interviewed Mark Orlando and Herva Jeannot, who were together the night of Calabrese's homicide. The detectives believed that Orlando and Jeannot had been with Calabrese that night. Orlando and Jeannot were questioned in separate rooms at the police station. Jeannot confessed to shooting Calabrese, stating that Orlando hired Jeannot to murder Calabrese to avoid paying a gambling debt to Calabrese. During his questioning, Orlando gave two different statements to the police but denied being involved in the murder.

Orlando and Jeannot were charged with murder for their roles in Calabrese's death and, in August 2005, a jury in the New York Supreme Court for Nassau County convicted Mark Orlando of murder in the second degree. The trial court had severed Orlando and Jeannot's trials to avoid a Sixth Amendment Confrontation

4

Clause violation that could have arisen from Orlando's jury hearing Jeannot's confession if Jeannot did not testify and thus could not be cross-examined about it.[4]  Severing the trials, however, did not avoid violating Orlando's right to confront the witnesses against him, as the trial court allowed the jury to learn of Jeannot's confession implicating Orlando at Orlando's trial and Jeannot did not testify at Orlando's trial.

## ORLANDO'S TRIAL

### I.	Evidence Before the Jury of Jeannot's Statement

The state's theory at trial was that Orlando paid Jeannot to murder Calabrese to extinguish a $17,000 gambling debt Orlando owed to Calabrese and that Orlando assisted Jeannot in the murder. The prosecution argued that Orlando lured Calabrese to the remote

---

[4] Although the record on appeal does not reflect the trial court's decision to sever the trials, both Orlando and the state describe the trial court as having (appropriately) severed Orlando and Jeannot's trials "pursuant to" *Bruton v. United States*, 391 U.S. 123, 124 (1968).  Pet. Br. at 2; Respondent's Br. at 39.

location near Long Beach[5] on the pretext of meeting to pay the $17,000 debt, but that Orlando had previously agreed to pay Jeannot to shoot Calabrese when Orlando met up with Calabrese. Orlando did not dispute at trial that he was present for the murder, but contended that he had intended merely to pay Calabrese; he did not expect Jeannot (who was a friend of Orlando's and a passenger in the car Orlando drove that night) to shoot Calabrese and then take the gambling money for himself.

During his police interrogation, Orlando gave two statements to Nassau County Police Detectives. Detectives McHugh and McGinn jointly interviewed Orlando when he gave his first statement, and Detective McHugh testified to this statement at Orlando's trial. According to McHugh, Orlando first stated that he and Jeannot were good friends and coworkers at Professional Credit Services, a Long

---

[5] Although officers from the Long Beach police department responded to the report of the homicide, the homicide occurred in Island Park, which is a town adjacent to Long Beach.

Island debt collection agency. Orlando regularly gambled on sports. About one month before the murder, another coworker introduced Orlando to Calabrese. Orlando began to place bets through Calabrese and soon won $28,465.

Orlando's winning streak with Calabrese ended, and Orlando lost $17,800 over the course of two weeks. At that point, Orlando stopped betting with Calabrese. But Orlando still owed Calabrese $17,000, and he arranged to pay Calabrese on December 3.

In that first statement to the Nassau County detectives, Orlando indicated that he and Jeannot went together in Orlando's wife's car to pay Calabrese, did so, and otherwise had an uneventful evening. After Orlando paid Calabrese the $17,000, he and Jeannot made several stops: at a Suzuki car dealership to pick up a check, at an ATM, and at Orlando's friend's house to look at some new construction. Orlando then dropped off Jeannot at Jeannot's home, around 10:30 p.m.

After Detective McHugh finished testifying, Detective McGinn took the stand and confirmed much of the substance of Orlando's first statement. According to McGinn, after Orlando signed a written statement summarizing that version of the night's events, Detectives McGinn and McHugh left the interview room. McHugh went to speak with Jeannot. Approximately three hours after leaving Orlando's interview room, McGinn returned to speak further with Orlando.

Before Detective McGinn had begun testifying at Orlando's trial (and out of the presence of the jury), counsel for Orlando had objected, on hearsay and Confrontation Clause grounds, to the admission of McGinn's anticipated testimony recounting Jeannot's statement as to Orlando's involvement in the murder. The trial court denied the objection, ruling that "this information that the People are intending to offer in their direct case is not being offered for the truth of the contents of the statement but rather to give a clear picture to the

8

jury [of] what was going on during the interrogation of [Orlando]."
T. 166–67.

After Orlando's objection was denied, the prosecution asked Detective McGinn about "the circumstances under which [McGinn] resumed speaking with" Orlando. T. 620.[6] McGinn testified that he had learned from Detective McHugh that Jeannot was making inculpatory statements about the murder. "I knew Detective McHugh was in talking to Mr. Herva Jeannot," McGinn testified. *Id*. "I believe," he told the jury, "that Herva Jeannot was relaying some of the events that really took place that night [of the murder]." *Id*.

McGinn then testified that he re-entered Orlando's interview room. *Id*. "I went back in and I told Mr. Orlando that Detective McHugh was over there talking to Herva [Jeannot] and he was probably giving us . . . other facts that happened that night, the truth

---

[6] Citations to the trial transcript are abbreviated "T. __" throughout this opinion.

9

as to what happened that night." *Id*. "Now, would be the time . . . to tell us what was going on." *Id*.

According to McGinn's testimony, Orlando responded, "[y]ou don't understand," and McGinn left the interview room. T. 620. McGinn testified that he returned a few minutes later. According to McGinn, "[a]gain, I explained to Mr. Orlando that Herva Jeannot was, in fact, giving up . . . what we felt were truer versions of the events of Bobby Calabrese's murder. That we had a videotape of the spot the meeting took place. That the meeting did not take place where [Orlando] originally told us it had taken place. I told [Orlando] that Herva Jeannot had given up where the gun was and that the defendant should . . .[,] if he wants his version of the story told[,] . . . tell us the truth at this point." T. 621.

Orlando initially responded, again, "you don't understand," but eventually stated, without elaboration, that he was afraid (of Jeannot) for his family. T. 621–23. McGinn testified that he again left

10

the interview room and that he came back around an hour later. He then testified, over the renewed objection of Orlando's attorney, to the following: "I told [Orlando] . . . that Herva Jeannot was, in fact, talking to the other detectives. [Jeannot] had given a statement and that he had implicated himself in the murder. [Jeannot] said that he was the murderer, but that Mark Orlando had paid him to do it." T. 623–24.

At this point, the trial court gave the jury a limiting instruction. The trial court stated, "Ladies and gentlemen, you have been permitted to hear testimony about remarks made to the defendant by Detective McGinn about statements allegedly made by Herva Jeannot. You're to consider this testimony only when considering the circumstances under which the defendant himself may have made statements and for no other purposes." T. 624.

The trial court then instructed the jury "to completely disregard any statement allegedly made by Herva Jeannot when considering evidence against the defendant. . . . You are not to concern yourself

11

with whether Herva Jeannot did or did not make any statements to the police, if he did, what those statement[s] may have been or whether or not they were true."[7] *Id.*

McGinn then resumed testifying. He testified that, after learning of Jeannot's statement implicating Orlando in the murder, Orlando changed his account of the evening's events. Orlando stated that when he and Jeannot met Calabrese that night, Orlando paid Calabrese and then Jeannot unexpectedly shot Calabrese, taking the cash.[8] T. 676–82. According to Orlando, he and Jeannot then drove away, and Jeannot threatened to harm Orlando's (pregnant) wife if

---

[7] During its final charge to the jury, the trial court gave substantially the same limiting instruction as to McGinn's testimony regarding Jeannot's statement as it had given earlier in the trial.

[8] Orlando first relayed this second version of events to McGinn. Then, McGinn left the room, and Nassau Country Detective Cerighino, who had not been present for the questioning of Orlando, came into the room. Cerighino reduced Orlando's second account to writing. Cerighino wrote the statement based upon what Orlando told him, and Orlando signed it. The written statement is substantially similar to McGinn's account at trial of the second version of events that Orlando gave to McGinn.

12

Orlando were to tell anyone about the homicide. T. 682. Jeannot told Orlando that Calabrese was not the first person Jeannot had killed and that Calabrese would not be the last. *Id*. As a result, according to Orlando, he then made the stops at the car dealership and elsewhere because he wanted people and cameras to observe that Jeannot was with him. In addition, at some point, Jeannot told Orlando to stop on a bridge, and Jeannot then threw the gun he used to kill Calabrese into the water.

## II. The Prosecution's Summation

The prosecution argued in its summation to the jury that Orlando had paid Jeannot to murder Calabrese. The prosecution also specifically called to the jury's attention that "Detective McGinn leaves [Orlando's interrogation room], comes back a little later, . . . [and] Detective McGinn finally says, look, [Jeannot's] giving it up. [Jeannot's] telling us everything. . . . He's telling us he did the shooting and you paid him." T. 894–95.

13

Apart from Jeannot's statement, there was little evidence to support the state's theory. The prosecution showed that, after the murder, investigators found in Jeannot's home five one-hundred dollar bills and found in Orlando's home ten one-hundred dollar bills, all of which had a large-portrait image of Benjamin Franklin. The prosecution argued, "How do you know [Orlando] paid [Jeannot?] Why else would [Jeannot] do it, if not for $500, those five Ben Franklins hundred dollar bills . . . a week after the execution murder. Just so happens the defendant has ten of his own [$100 bills] back in [his home]. Of course [Orlando] paid [Jeannot]. [Jeannot's] not doing it as a favor." T. 876.

The prosecution again returned to its "murder-for-hire" theory later in its closing argument, stating that "[Orlando] wasn't upset by watching Bobby die. That was what was supposed to happen. That is what he paid [Jeannot] to do, to do his dirty work for him. Couldn't do it himself." T. 885. The prosecution suggested that Orlando paid

14

Jeannot when the pair briefly stopped at Orlando's house after the murder. T. 890.

### III. Verdict and Sentence

The jury found Orlando guilty of murder in the second degree. Orlando was sentenced to an indeterminate term of 25 years to life in prison on August 18, 2005. He is currently serving his sentence. Jeannot was also convicted of the murder in a separate trial.

## STATE COURT APPELLATE PROCEEDINGS

Orlando appealed his conviction to the New York Supreme Court, Appellate Division. *People v. Orlando*, 61 A.D.3d 1001 (N.Y. App. Div. 2d Dep't 2009). Orlando contended that Detective McGinn's testimony as to Jeannot's statement was inadmissible hearsay and also violated Orlando's right to confront witnesses through cross examination, as guaranteed by the Sixth Amendment of the United States Constitution and incorporated against the states by the Fourteenth Amendment. Appellant's Br. at 70–77, *People v.*

15

*Orlando*, No. 2005-08854 (N.Y. App. Div. 2d Dep't Mar. 23, 2008); *Orlando*, 61 A.D.3d at 1001–03.

The Appellate Division rejected Orlando's argument in a single sentence, stating: "The [trial] court properly instructed the jury that the testimony was admitted for the limited purpose of explaining the detective's actions and their effect on the defendant, and not for the truth of the codefendant's statement." *Id.* (quoting *People v. Ewell*, 12 A.D.3d 616, 617 (N.Y. App. Div. 2d Dep't 2004)) (internal quotation marks omitted).[9] The Appellate Division also cited *Tennessee v. Street*, 471 U.S. 409 (1985), for its conclusion that the trial court did not err in admitting Jeannot's statement through Detective McGinn. *Id.*

---

[9] Although the Appellate Division described Jeannot as a "codefendant," as is mentioned in the above text, he was tried and convicted at a separate trial after the *Bruton* ruling severing the trials.

The New York Court of Appeals subsequently denied Orlando leave to appeal, thereby rendering the Appellate Division's decision final. *People v. Orlando*, 981 N.E.2d 291, 291 (N.Y. 2012).[10]

**SECTION 2254 PROCEEDING IN THE DISTRICT COURT**

Orlando, proceeding *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of New York. As in his direct appeal, Orlando argued that McGinn's testimony regarding Jeannot's statement was inadmissible hearsay and violated his Confrontation Clause right. The district court denied the writ.[11]

The district court identified the following testimony by McGinn as at issue in the Confrontation Clause analysis:

---

[10] Following his unsuccessful state appeals, Orlando filed two unsuccessful *coram nobis* petitions in state court alleging ineffective assistance of appellate counsel. *See People v. Orlando*, 85 A.D.3d 823 (N.Y. App. Div. 2d Dep't 2011); *People v. Orlando*, 98 A.D.3d 691 (N.Y. App. Div. 2d Dep't 2012). There is no dispute that Orlando has properly exhausted his Confrontation Clause claim for federal habeas review.

[11] Orlando pursues only his Confrontation Clause challenge on appeal. *See generally* Pet. Br.

17

I left the [interrogation] room at about 6:50 [AM].  I went back into the room at about ten minutes to eight. About 7:50 in the morning.  And I told [Orlando] at this point that Herva Jeannot was, in fact, talking to the other detectives. He had given a statement and he had implicated himself in the murder.  He said that he was the murderer, but that Mark Orlando had paid him to do it.

*Orlando v. Nassau Cty. Dist. Atty's Office*, 246 F. Supp. 3d 569, 572–73 (E.D.N.Y. 2017).[12]

Relying principally on *Tennessee v. Street*, 471 U.S. 409 (1985), and *United States v. Logan*, 419 F.3d 172 (2d Cir. 2005), the district court rejected Orlando's Confrontation Clause argument.  *Orlando*, 246 F. Supp. 3d at 571–76.  The district court reasoned that Jeannot's statement was not offered against Orlando for its truth but only "provided context for explaining why Orlando altered his [original]

---

[12] The district court did not recount or discuss the portion of McGinn's testimony to the jury that vouched for the truth of Jeannot's statement.  T. 620 ("Herva Jeannot was relaying some of the events that really took place that night . . . the truth as to what happened that night."); T. 621 ("I explained to Mr. Orlando that Herva Jeannot was, in fact, giving up *what we felt* were truer versions of the events of Bobby Calabrese's murder.") (emphasis added).  That aspect of McGinn's testimony is discussed later in this opinion.

exculpatory story" to admit that he had in fact been present for the murder but that Jeannot had unexpectedly committed it. *Id.* at 574. The district court also held that any error was harmless. *Id.* at 575–76.

The district court issued a certificate of appealability as to Orlando's Confrontation Clause argument. *Id*. at 578. Orlando then timely filed a notice of appeal.

**DISCUSSION**

Orlando argues that: (1) without his ability to cross-examine Jeannot, McGinn's testimony recounting Jeannot's statement violated Orlando's Confrontation Clause right; (2) the Appellate Division's ruling to the contrary was "objectively unreasonable;" and (3) the erroneous admission of the testimony was not harmless. We agree. Accordingly, we reverse the district court's denial of Orlando's petition.

**I.      Standard of Review and Section 2254 Framework**

Under 28 U.S.C. § 2254, "a person in custody pursuant to the judgment of a State court" may petition a district court for a writ of habeas corpus "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." *Id.* § 2254(a). We review *de novo* a district court's denial of a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *Lynch v. Dolce*, 789 F.3d 303, 311–12 (2d Cir. 2015).

A petition for a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d). "A state court decision is an 'unreasonable application' of clearly established federal law 'if the state court identifies the correct governing legal principle

20

from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'"  *Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).  However, that bar is not reached where "fairminded jurists could disagree on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks and citation omitted).

**II.     The Confrontation Clause Violation**

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "'The crux of this right is that the government cannot introduce at trial" an out-of-court witness's "statements containing accusations against the defendant unless the accuser takes the stand against the defendant and is available for cross examination.'"  *United States v. Jass*, 569 F.3d 47, 55 (2d Cir. 2009) (quoting *Ryan v. Miller*, 303 F.3d 231,

247 (2d Cir. 2002)) (internal quotations omitted). To implicate the Confrontation Clause, the statement must be used to prove the truth of the matter asserted, and the statement must be "testimonial." *Davis v. Washington*, 547 U.S. 813, 821–22 (2006) (citing *Crawford v. Washington*, 541 U.S. 36, 51 (2004)). In other words, it must be "testimonial hearsay." *Id*. at 823.

Out-of-court statements may have a proper purpose other than being considered for their truth. The Supreme Court and this Circuit have acknowledged that a trial court's instruction to a jury to consider only for a limited, nonhearsay purpose the non-testifying witness's out-of-court statement "is generally sufficient to eliminate . . . Confrontation Clause concern[s]." *Jass*, 569 F.3d at 55 (citing *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)). That is because "[t]he law 'almost invariabl[y] assum[es]' that jurors follow such limiting instructions." *Id*. (quoting *Richardson*, 481 U.S. at 206).

"Nevertheless, in *Bruton v. United States*, . . . the Supreme Court identified an exception to th[e] assumption" that jurors follow limiting instructions. *Id*. In *Bruton v. United States*, 391 U.S. 123, 124 (1968), the defendant Bruton and his codefendant were tried jointly for armed postal robbery. A postal inspector testified that the codefendant confessed to him that Bruton and the codefendant committed the robbery together. *Id.* The codefendant did not take the stand, so he could not be cross-examined. *Id.* at 128. The district court provided a limiting instruction to the jury that "although [the codefendant's] confession was competent evidence against [the codefendant] it was inadmissible hearsay against [Bruton] and therefore had to be disregarded in determining [Bruton's] guilt or innocence." *Id.* at 125.

The Supreme Court reversed Bruton's conviction, holding that because his codefendant was not subject to cross examination and "because of the substantial risk that the jury, despite instructions to

23

the contrary, looked to the incriminating extrajudicial statements in determining [Bruton's] guilt," admission of the codefendant's confession in front of Bruton's jury violated Bruton's "right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.* at 126.

The Court further explained that "[n]ot only are [alleged accomplices'] incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice . . . does not testify and cannot be tested by cross-examination." *Id.* at 136.

As a result, when a non-testifying witness's confession "expressly" implicates the defendant, "the risk that the jury will not, or cannot, follow instructions [to limit its consideration of the

24

evidence for a proper purpose] is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Richardson*, 481 U.S. at 207–08 (quoting *Bruton*, 391 U.S. at 135–36)*.* When a jury hears such express incriminations, even if given a "clear" limiting instruction, "the effect is the same as if there had been no instruction at all." *Bruton*, 391 U.S. at 137.

Although the non-testifying witness in *Bruton* was a codefendant in a joint trial, *Bruton* applies equally to the testimonial and incriminating statements of non-testifying accomplices tried separately. *See Crawford*, 541 U.S. at 57, 69 (stating that testimonial statements admitted without the opportunity to cross-examine the declarant violate the Confrontation Clause and referring to *Bruton* as barring "accomplice confessions where the defendant had no opportunity to cross-examine"); *Tennessee v Street*, 471 U.S. 409, 411, 414–15 (1985) (recognizing that if the jury had been asked to infer that

25

the confession of the non-testifying accomplice—who was tried separately—proved that the defendant participated in the murder, "Confrontation Clause concerns would have been implicated").

Here, the Appellate Division correctly acknowledged that, absent cross-examination of Jeannot, admission of his facially incriminating statement risked violating the Confrontation Clause, as was recognized in *Bruton*.[13] *People v. Orlando*, 61 A.D.3d at 1002. However, the Appellate Division reasoned that the jury would use this evidence only to "explain the detective's actions and their effect" on Orlando—that effect presumably being the reason why Orlando changed his account of the events of the night of the murder. *Id*.

---

[13] Although the Appellate Division did not cite *Bruton* or articulate its holding, a state reviewing court need not to do so in order for it to be considered to have applied the constitutional principles set forth in Supreme Court precedent. *See, e.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) ("[A] state court need not even be aware of our precedents, so long as neither the reasoning nor the result of the state-court decision contradicts them.") (internal quotation marks and citation omitted). The Appellate Division did cite *Tennessee v. Street*, 471 U.S. 409 (1985), which is discussed later in this opinion.

That conclusion by the Appellate Division was an unreasonable application of *Bruton*. McGinn led the jury to believe that Jeannot had actually made the statement McGinn recounted, and that statement expressly inculpated Orlando as Jeannot's accomplice in the murder. *Bruton* plainly instructs that the jury could not be presumed to disregard Jeannot's statement for its truth, even with a limiting instruction.[14]

**A. Jeannot Was an Out-of-Court Witness**

The state argues in its brief that "[n]either McGinn nor McHugh ever testified that Jeannot actually made the statements at issue," Respondent's Br. at 29–30; in other words, that Jeannot was not an out-of-court "witness" within the meaning of the Confrontation Clause, *see Davis*, 547 U.S. at 821–22. And so, the state

---

[14] In addition, there is no doubt that Jeannot's statement was "testimonial." *See Davis*, 547 U.S. at 821–22 (holding that statements made "in the course of police interrogation" are testimonial when made under "circumstances objectively indicat[ing] . . . that the primary purpose of the interrogation [was] to establish or prove past events potentially relevant to later criminal prosecution").

contends, the situation here was no different than a jury merely hearing that an investigator had used deception to elicit a confession.

The state is incorrect; of course the prosecution led the jury to believe that Jeannot had actually made the statement McGinn recounted. McGinn testified that, "I knew Detective McHugh was in talking to Mr. Herva Jeannot," and that, "I believe that Herva Jeannot was relaying some of the events that really took place that night." T. 620. The prosecution never disavowed that Jeannot had made the statement, and it even recounted the statement in its summation. And that very statement was the reason for the *Bruton* severance in the first place. Thus, Jeannot was indeed an out-of-court "witness" subject to the cross-examination requirements of the Confrontation Clause.[15]

---

[15] A witness need only recount the critical substance of the out-of-court statement to implicate the Confrontation Clause. *See Ryan v. Miller*, 303 F.3d 231, 248–49 (2d Cir. 2002) (granting section 2254 petition due to non-harmless Confrontation Clause violation, stating that "[i]f the substance of the prohibited testimony is evident even though it was not introduced in the prohibited form, the testimony is still inadmissible," and collecting cases); *Ocampo v. Vail*, 649 F.3d 1098, 1108–11 (9th Cir. 2011) ("Supreme Court law . . . clearly establishe[s] that testimony from

28

**B. The Admission of Jeannot's Statement Was Clearly Barred by *Bruton***

With the jury having heard this expressly incriminating statement from Jeannot, the only reasonable conclusion was that the Confrontation Clause was violated under *Bruton*. The risk that the jury would consider Jeannot's statement for its truth was simply too great to allow the jury to hear it, absent cross-examination of Jeannot. Indeed, "the overwhelming probability" of jurors' inability to "thrust out of mind" express "testimony that 'the defendant helped me commit the crime' . . . is *the foundation of Bruton*." *Richardson*, 481 U.S. at 208 (emphasis added); *see also Bruton*, 391 U.S. at 129 ("The Government should not have the windfall of having the jury be influenced by evidence against a defendant which, as a matter of law, they should not consider but which they cannot put out of their minds.") (internal quotation marks and citation omitted) (overruling

which one could determine the critical content of the out-of-court statement [is] sufficient to trigger Confrontation Clause concerns.").

*Delli Paoli v. United States*, 352 U.S. 232 (1957), and adopting the reasoning of the dissent in that decision).

The Confrontation Clause violation here is even clearer than in *Bruton*. Detective McGinn did not merely recount Jeannot's confession implicating Orlando; he also vouched for its veracity. McGinn testified, "I *believe* that Herva Jeannot was relaying some of the events that *really* took place that night . . . the truth as to what happened that night," T. 620 (emphasis added), and "I explained to Mr. Orlando that Herva Jeannot was, in fact, giving up . . . *what we felt were truer versions of the events of Bobby Calabrese's murder*."[16] T. 621 (emphasis added). That testimony by McGinn made it even less likely than in *Bruton* that the jury would have obeyed the trial court's limiting instruction. *See, e.g., United States v. Forrester*, 60 F.3d 52, 63–

---

[16] We acknowledge that the latter statement could possibly be read as McGinn explaining *only to Orlando* rather than to the jury that McGinn and McHugh believed Jeannot was telling the truth about Orlando's involvement the murder. However, there was no such ambiguity with regard to McGinn's first statement that he believed Jeannot was relaying what "really took place that night." T. 620.

64 (2d Cir. 1995) (discussing the prejudicial impact of government agents vouching for witnesses).

Likewise, the prosecution's summation further undermined any possible effectiveness of the limiting instruction when it reminded the jury of its murder-for-hire theory three times and specifically called to its attention McGinn's testimony that he told Orlando, "[Jeannot's] telling us everything . . . . He's telling us he did the shooting and you paid him." T. 895. But, as discussed below with regard to the harmless error analysis, the evidence—other than Jeannot's statement—that Orlando had hired Jeannot to murder Calabrese, was weak. Thus, the likelihood that the jury credited Jeannot's statement was higher even than in *Bruton*, where the Supreme Court did not suggest that the prosecution had undermined the limiting instruction.[17]

---

[17] We note also that the limiting instruction was decidedly unclear. The trial court instructed the jury to consider the testimony at issue when considering "the circumstances under which Orlando made any statements." T. 624. McGinn, however, had just told the jury that the "circumstances" which led him to resume

31

In opposing Orlando's petition, the state relies primarily on the Supreme Court's decision in *Tennessee v. Street*, 471 U.S. 409 (1985). In *Street*, the defendant, Street, was tried for murder separately from his alleged accomplice, Peele. *Id.* at 411. Street had confessed during an interview with police to participating in a burglary and the murder with Peele. *Id.*

In its case-in-chief, the state introduced Street's confession. *Id.* Street then took the stand during his defense case, and he testified that the police had coerced his confession and that he had not been involved in the murder. *Id.* Street claimed that the police had shown him Peele's confession during his interview and forced Street to give the same account as Peele. *Id.*

The trial court then permitted the state to introduce in its rebuttal case Peele's confession through the testimony of Sheriff

---

interrogating Orlando were that "Herva Jeannot was relaying some of the events that really took place that night." T. 620. By contrast, even in *Bruton*, the jury instructions were "concededly clear." *Bruton*, 391 U.S. at 137.

Papantoniou, the police officer who had taken it. *Id.* at 411–12. The state showed the obvious differences between the two statements to discredit Street's testimony that his confession had been coerced and that the statements' claimed similarities demonstrated the coercion. *Id.* at 412. Both at the time the police officer recounted Peele's statement and in its jury instructions, the trial court instructed the jury that Peele's statement was admitted not for its truth, but rather only to rebut Street's contention that his confession was coerced. *Id.* Peele did not testify at Street's trial and, thus, could not be cross-examined about his statement.

The Supreme Court affirmed Street's murder conviction. *Id.* at 417. According to the Court, "[t]he nonhearsay aspect of Peele's confession—not to prove what happened at the murder scene but to prove what happened when respondent confessed—raises no Confrontation Clause concerns. The Clause's fundamental role in protecting the right of cross-examination . . . was [thus] satisfied by

33

Sheriff Papantoniou's presence on the stand." *Id*. at 414. After all, the Supreme Court stated, "[i]f [Street's] counsel doubted that [the accomplice's] confession was accurately recounted, he was free to cross-examine the Sheriff. By cross-examination [Street's] counsel could also challenge Sheriff Papantoniou's testimony that he did not read from Peele's statement and direct respondent to say the same thing. In short, the State's rebuttal witness against [Street] was not Peele, but Sheriff Papantoniou." *Id.*

The Court in *Street* went on to acknowledge that its conclusion depended on the "crucial assumption" that the jurors followed the trial court's limiting instructions. *Id*. at 415. There, as in *Bruton*, Street's accomplice had expressly implicated him in the crime. But unlike in *Bruton*, Street had placed the state in the position of not being able to effectively challenge Street's testimony that his confession was coerced. And "the State's most important piece of substantive evidence was [Street's] confession." *Id*. The only

34

available way to rebut Street's contention of a coerced confession was to compare Peele's confession with Street's; if they were different, that would tend to show that Street's coercion testimony was not credible. *See id*. at 415–16. And so, if the trial court in *Street* had not allowed the accomplice's confession to be brought before the jury, that "would have been at odds with the Confrontation Clause's very mission—to advance the accuracy of the truth-determining process." *Id*. at 415.

Thus, the Court in *Street* found, unlike in *Bruton*, that there were "no alternatives [but allowing admission of the accomplice's confession] that would have both assured the integrity of the trial's truth-seeking function and eliminated the risk of the jury's improper use of evidence." *Id*.

Notably, in its conclusion, the Court in *Street* also took care to emphasize that the "prosecutor's questions and closing argument" had done nothing to distract the jury from the accomplice confession's "distinctive and limited purpose." *Id*. at 417. It was only "*in this*

35

*context*" that the trial judge's instructions were sufficient to prevent a Confrontation Clause violation. *Id*. (emphasis added).

This case is very different from *Street*. The prosecution argued that Jeannot's statement merely showed "context" for why Orlando changed his statement. But Jeannot's statement went far beyond any limited value in showing why Orlando changed his account of what happened that night. The prosecution elicited testimony from Detective McGinn that Jeannot had actually made the incriminating statement, and McGinn vouched for Jeannot's account. In its summation, the prosecution also repeated Jeannot's statement, and pressed its murder-for-hire theory.

Moreover, the prosecution's need for the purported "context" was of little importance as compared to the need in *Street*. Orlando's changing his account of the homicide was no different than many investigations when suspects make a series of statements; absent the substance of Jeannot's statement, the jury still could have learned that

36

after several hours of interrogation, Orlando revised his story and placed himself at the scene of the murder and admitted to lying about his original account. That approach would have significantly advanced the prosecution's case without a critical narrative gap and, accordingly, the "truth-seeking function" of the trial would not have been impeded in a way comparable to *Street*. *See id.* at 415–16. Nor did Orlando take the stand at his trial, and so the credibility of his own trial testimony was not an issue, unlike in *Street* where the state otherwise would not have been able to challenge Street's principal defense of coercion in giving his statement.

To extend *Street* to the situation presented here would eviscerate the core protection of *Bruton*. To allow admission of Jeannot's statement through McGinn would permit the admission of inculpatory statements of non-testifying codefendants whenever the defendant changed his initial statement to investigators after investigators told the defendant of an accomplice's incriminating

37

confession.  The prosecution would need only then argue to the trial court that the other confession was being shown to the jury just to show why there were changes to the original statement.[18] [19]

* * *

---

[18] The state also contends that the admission of Jeannot's statements established "the voluntariness of [Orlando's] statements."  Respondent's Br. 30–31, 35.  But, unlike Street, Orlando did not contest their voluntariness at trial.   And, there was other evidence that Orlando's statements were voluntary.  The detectives testified that Orlando was advised of his *Miranda* rights and agreed to speak with them, and Orlando indicated that he understood his *Miranda* rights, was willing to give a statement without speaking with a lawyer or having one present, and that he was "mak[ing] the . . . statement[s] freely and voluntarily."  T. 546.

[19] Other circuits have also recognized that *Street* does not permit the admission of an out-of-court accomplice statement merely because it may have some purpose other than for its truth. *See, e.g., Thomas v. Hubbard*, 273 F.3d 1164, 1172–73 (9th Cir. 2001) (granting section 2254 petition due to Confrontation Clause violation and other constitutional errors, and stating that "[e]ven if the statements [we]re classified as non-hearsay, they are sufficiently prejudicial that the jury would be unable to consider them only for limited purposes and would consider them for their truth in violation of the Confrontation Clause") (abrogated on unrelated grounds by *Payton v. Woodford*, 299 F.3d 815, 828–29 n.11 (9th Cir. 2002), which the Supreme Court then vacated, 538 U.S. 975 (2003)); *cf. United States v. Taylor*, 569 F.3d 742, 750 (7th Cir. 2009) (finding no Confrontation Clause violation because the out-of-court statements were nonhearsay and there were no "complicating circumstances, *such as a prosecutor who exploits nonhearsay statements for their truth*") (internal quotation marks and citation omitted) (emphasis added).

38

We hold that the Appellate Division unreasonably applied *Bruton* in concluding that Orlando's Sixth Amendment right to cross-examine a witness against him was not violated when the jury heard of Jeannot's statement implicating Orlando in the murder. To the extent that the Appellate Division applied *Street*, it also extended that decision unreasonably.[20]

**III.    The Error Was Not Harmless**

As Orlando and the state agree, the improper admission of evidence in violation of the Confrontation Clause is subject to review for harmless error. *Hendrix v. Smith*, 639 F.2d 113, 115 (2d Cir. 1981) (citing *Chapman v. California*, 386 U.S. 18 (1967); *Schneble v. Florida*, 405 U.S. 427 (1972)). When a state court makes a harmless error

---

[20] The state's reliance on *United States v. Logan*, 419 F.3d 172 (2d Cir. 2005), is also misplaced. In *Logan*, the coconspirators' statements concerning an alibi were admitted only to show the existence of a conspiracy. *Id*. at 176–78. Moreover, the statements were not admitted for their truth but—to the contrary—were shown to be untruthful. *Id*. Here, Jeannot's statement—as recounted by Detective McGinn—was consistent with the state's theory and was specifically utilized by the state to support that theory.

determination on direct appeal, we owe the "harmlessness determination itself" deference under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Ayala*, 135 S. Ct. at 2199. Here, because the Appellate Division did not determine that the admission of McGinn's testimony as to Jeannot's statements was harmless, we owe no deference to the Appellate Division on that issue. *E.g., Cotto v. Herbert*, 331 F.3d 217, 253 (2d Cir. 2003) ("In this case, harmless error was never reached in the state courts, and there is therefore no state ruling which commands AEDPA deference.").

An error was harmless unless it resulted in "actual prejudice," *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)), meaning that a court has "grave doubt about whether" the error "had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 2198 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). This "*Brecht* standard"

40

requires "more than a 'reasonable possibility' that the error was harmful." *Id.* (quoting *Brecht*, 507 U.S. at 637).

We have little doubt that the improperly admitted testimony as to Jeannot's statement had such a powerful effect on the jury. The prosecution's theory was that Orlando was guilty of murder for acting as Jeannot's accomplice by paying Jeannot to shoot Calabrese and helping Jeannot to do so. The trial judge instructed the jury that, to convict Orlando, the prosecution had to prove that Orlando acted in concert with Jeannot. The state argues that, even absent admission of Jeannot's confession through McGinn's testimony, the evidence of Orlando's guilt was "nothing short of overwhelming." Respondent's Br. at 47.

In support, the state contends that Orlando's $17,000 gambling debt to Calabrese was compelling evidence of motive; that the hundred-dollar bills found in the homes of both Orlando and Jeannot after the murder were evidence of the murder-for-hire transaction;

41

and that forensic testimony as to the location of bullet holes in Calabrese's sweatshirt showed that Orlando pulled the sweatshirt over Calabrese's head before Jeannot shot him. Finally, the state emphasizes that the video evidence, as well as cell site evidence, showed that Orlando was at the location where the homicide occurred. We address these arguments in turn.

**A. Evidence of Motive**

Although it was undisputed that Orlando owed Calabrese $17,000, the evidence showed that Orlando had won $27,000 in the month prior. Accordingly, he had net winnings of $10,000 over a six-week period. Moreover, the evidence showed that Orlando had $2,700 in cash in his residence after the murder (and after he purportedly paid Jeannot to commit the murder). And so, the evidence that Orlando lacked the funds to pay Calabrese was slight.[21]

---

[21] The state also did not introduce evidence of Orlando's bank records at trial.

Moreover, it strains credulity that Orlando would have believed that murdering a *courier* in an illegal gambling operation would erase a gambling debt of $17,000 and prevent attempts by the other members of the gambling operation to seek payment. The prosecution argued that Orlando's plan was to murder Calabrese and then claim to Calabrese's superiors in the illegal sports betting organization that he had paid Calabrese (and that Calabrese must have been robbed and murdered by someone else). But it certainly is not obvious that Orlando would have thought such a plan would work.

**B. Evidence of a Murder-for-Hire Transaction**

Similarly, the discovery of a small number of one-hundred-dollar bills in the homes of both Orlando and Jeannot after the murder was not particularly probative of a murder-for-hire transaction. The state asserts that the hundred-dollar bill design with "the large picture of Ben Franklin" was "then new" and, thus so rare as to mean

43

Jeannot's bills likely came from Orlando. Respondent's Br. at 48. But that design began circulating in 1996,[22] eight years before the murder of Calabrese. A jury thus would not have found it remarkable that the bills in both homes had the same design. Nor did the U.S. currency found in Jeannot's home have any fingerprints, sequential serial numbers, or DNA that might have linked them to a transaction between Orlando and Jeannot.

In addition, only $500 in bills was found in Jeannot's home. It is entirely unclear why Jeannot would accept only $500 to commit a murder, particularly given that Jeannot undisputedly knew Orlando owed Calabrese many times that amount. The prosecution suggested that the $500 found in Jeannot's home may have been only a small portion of the murder-for-hire payment. But the prosecution

---

[22] *See, e.g.,* Carl Rochelle, *Redesigned $100 Bill Aimed at Foiling Counterfeiters*, CNN (Mar. 25, 1996, 1:35 AM), http://edition.cnn.com/US/9603/new_100_bill/index.html (stating that the redesigned $100 bills with a larger Ben Franklin were to go into circulation on March 25, 1996).

presented no theory or evidence as to what may have happened to any cash payment that exceeded the $500 found.

**C. Forensic Evidence**

We turn next to the expert testimony of two other Nassau County detectives and Nassau County Deputy Chief Medical Examiner DeMartino regarding the bullet holes in Calabrese's sweatshirt. The state argues that forensic evidence clearly established that, just before Jeannot fired the first shot, Orlando pulled Calabrese's sweatshirt over Calabrese's head to help Jeannot shoot him.[23]

We disagree that this evidence was persuasive of Orlando helping Jeannot shoot Calabrese. First, the location of the bullet holes did not clearly establish that Calabrese's sweatshirt had been pulled up over his head at the time the *first* shot was fired. That is the

---

[23] The district court agreed with that argument, stating that the forensic evidence gave rise to "an inescapable inference . . . that Orlando . . . pulled the sweatshirt over Calabrese's head." *Orlando*, 246 F. Supp. 3d at 576.

relevant time that, according to the prosecution, Orlando would have been pulling up the sweatshirt. The first shot undisputedly went through Calabrese's right forearm, making holes only in his sweatshirt sleeve, and the bullet then lodged in the right side of Calabrese's head. The prosecution suggested to the jury that Orlando had pulled the sweatshirt so far over Calabrese's head that the back of his head was exposed, allowing the first bullet to pass through the sleeve without creating any other holes in the sweatshirt. That is possible, but that evidence is just as—if not more—consistent with Calabrese, for example, putting up his arms in a defensive position, and the first bullet passing through his right sleeve and arm, and then, into his uncovered[24] head. Indeed, the medical examiner DeMartino concluded that the wound in Calabrese's right arm was consistent

---

[24] Nassau County Forensic Evidence Bureau Detective Kovar, whom the prosecution called to testify as to trace forensic evidence at the scene of the crime, agreed that the hood of the sweatshirt was not covering Calabrese's head at the time the first shot was fired.

46

with Calabrese having raised his arm in a defensive manner prior to the first shot being fired. Or, even if the sweatshirt had been pulled up, it could have been done by Jeannot prior to shooting Calabrese.

By contrast, the forensic evidence was clearer that at the time the second and third shots were fired into the back of Calabrese's head, his sweatshirt was pulled up over his head. There were holes in the back of Calabrese's sweatshirt that matched up with the bullet wounds in the back of his head. But, it is not disputed that at the time the second and third shots were fired, Calabrese was already lying, face-down, on the ground from the effect of the first shot. Maybe Orlando pulled the sweatshirt over Calabrese's head after the first shot; maybe it was Jeannot who pulled up the sweatshirt at this point to avoid blood splatter; or maybe the sweatshirt came upward as Calabrese fell to the ground and struggled after the first shot. In any event, the only obvious conclusions from the sweatshirt and autopsy evidence were that Calabrese was first shot by Jeannot from behind,

47

while he was standing up, and then twice more while lying on the ground, with the sweatshirt over his head for the second and third shots. But it is far from clear how the sweatshirt ended up over his head.

The state introduced no other forensic evidence pointing to Orlando, such as DNA, fingerprints, or blood in his car or on his clothing. In sum, the forensic evidence to support the prosecution's accomplice theory was insubstantial.

**D. Orlando's Choice of a Meeting Location**

The evidence that Orlando chose a discreet meeting location to pay his debt to Calabrese was also only minimally probative of his guilt. Orlando told investigators that he and Calabrese had arranged to meet on December 3 in Island Park, and that he called Calabrese shortly beforehand to change the meeting to a more secluded place because there were several people within sight of the planned meeting location.

Jurors could have credited Orlando's choice of meeting location as part of a plan to murder Calabrese, but they could also reasonably have accepted that Orlando was concerned about being seen engaging in an illegal $17,000 gambling transaction.

**E.  Evidence of an Attempt to Create an Alibi**

The prosecution also contended that the jury could have construed Orlando's several stops after the murder as evidence of an attempt to manufacture a false alibi.  Orlando explained the stops as an attempt to be seen with Jeannot, so that Jeannot could not blame the murder on Orlando.  But, a jury could instead have reasonably inferred that, given Jeannot's purported threat to Orlando to maintain his silence, Orlando's behavior after the murder was consistent with an attempt to put Jeannot at ease that Orlando would not report Jeannot's role in the murder.

49

**F. Evidence Orlando Was at the Murder Scene**

Lastly, we acknowledge that the prosecution needed only to convict Orlando of murder and not to prove specifically its murder-for-hire theory. In that regard, the state emphasizes, for example, the evidence that Orlando was present at the murder scene. In addition, Orlando's coworker Barbara Diamant testified that Orlando told her the morning after the homicide that Calabrese had been shot in the back of the head three times, before this became public information. However, that Orlando was present for the murder was not disputed by him in his second statement or at trial, and as discussed above, the evidence that Orlando assisted the murder in some way was made substantially stronger by Jeannot's incriminating confession.

                               *       *       *

In sum, considered both in isolation and cumulatively, the properly admitted evidence of Orlando's guilt leaves us with "grave doubt" about whether the trial court's error substantially and

50

injuriously influenced the jury's verdict. *See Davis*, 135 S. Ct. at 2198. McGinn's testimony of Jeannot's incriminating statement was essential in persuading the jury of Orlando's guilt and meets the bar set by the *Brecht* standard. Accordingly, the constitutional error in this case was not harmless.

**CONCLUSION**

For the foregoing reasons, we **REVERSE** the district court's denial of Orlando's petition, and **REMAND** the case to the district court with instructions to issue a writ of habeas corpus to Orlando on the sixtieth calendar day after the issuance of our mandate unless the District Attorney of Nassau County has, by that time, taken concrete and substantial steps to expeditiously retry Orlando. The mandate shall issue forthwith.

SHEA, *District Judge*, dissenting:

I respectfully dissent. Federal habeas relief is available under Section 2254 only to remedy "extreme malfunctions in the state criminal justice systems" in "cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011). The New York court's application of *Tennessee v. Street*, 471 U.S. 409 (1985), the Supreme Court decision most pertinent to this case, does not satisfy that demanding standard because it reflects a reasonable accommodation of the competing interests identified in that decision. The *Street* Court held that the Confrontation Clause's "mission" is "to advance the accuracy of the truth-determining process in criminal trials," and that to fulfill that mission, trial judges must attend to *both* "assur[ing] the integrity of the trial's truth-seeking function *and* eliminat[ing] the risk of the jury's improper use of evidence." *Id.* at 415 (emphasis added). Here, the state trial judge reasonably applied the first of those two principles by admitting the detective's account of Jeannot's accusation for the proper, non-hearsay purpose of allowing the State to counter the defendant's explanation about

1

why he changed his story. Excluding that evidence would have enhanced the credibility of Orlando's second version of events, which was the one his lawyer urged the jury to adopt, and thus frustrated the trial's truth-seeking function. The trial judge also reasonably applied the second principle by twice giving a detailed limiting instruction that the jury was not to consider Jeannot's accusation for its truth and, indeed, not to consider whether he had made it at all. While I acknowledge that this case is harder than *Street*, I conclude that fairminded jurists could disagree on whether the state court properly applied that decision and thus that the district court properly denied the writ.

## I

The majority's recounting of the record is thorough, but I offer two clarifications to explain my views.

First, Orlando's trial counsel did not object to all of Detective McGinn's testimony about the interview with Jeannot. Indeed, he used a portion of it to bolster Orlando's explanation that he changed his story and told the truth once his fear of Jeannot had lifted after he learned that Jeannot had confessed. The issue involved in this appeal first arose when

2

the State sought a ruling *in limine* to admit Detective McGinn's testimony that "I confronted [Orlando], I told him that [Jeannot's] giving it up and he's telling us he did the shooting and he's telling us you made him." T. 164. During the *in limine* proceeding, the prosecutor told the trial judge that the purpose of this testimony would be "to establish the context in which the defendant all of a sudden changes his initial story . . . ." *Id.* Defense counsel then made his Confrontation Clause objection, pointing out that there had been a *Bruton* severance "to protect the defendant not being able to cross examine any statements that would be used against him in this case such as the codefendant's Herva Jeannot . . . perhaps even six as a number of statements that Mr. Jeannot had made." T. 165.[1] Specifically addressing the prosecutor's motion, he then stated as follows:

> "[I]f we're talking perhaps about one of the last statements that Mr. Jeannot had made regarding . . . giving it up or giving up the entire thing, opposed to that Mr. Jeannot had shot Mr. Calabrese, obviously I have no opposition to that. However, it's a matter of how much of that statement is going to be permitted . . . . But, I think in regard to what is being said and being [pared] down, I have no

[1] While the record does not disclose the trial judge's ruling regarding the *Bruton* severance, defense counsel's reference to "a number of statements" by Jeannot suggests there was more to it than merely eliminating the "payment" statement from Orlando's trial. It is thus not clear from the record that the "payment" statement "was the reason for the Bruton severance in the first place." Maj. Op. at 28.

3

opposition to the fact Mr. Jeannot had indicated that Mr. Jeannot was present and Mr. Jeannot shot him. But I think anything in addition to that, again, is prejudicial. It violates my ability and right to cross-examine the individual that is now accusing my client of that, and I would move to preclude anything in addition to that first portion . . . ."

T. 165–66. In other words, defense counsel did not object to the portion of McGinn's statement that Jeannot said he shot Calabrese but did object to the portion that Jeannot said Orlando paid him to do it.[2] That was a sensible trial strategy, because the former portion supported Orlando's second version of events and his explanation that he lied initially out of fear of Jeannot and came clean once he learned that Jeannot had confessed. Defense counsel harped on this latter theme in both his opening statement and closing argument. T. 205 ("It's not until Herva Jeannot tells the detective that Herva Jeannot himself had shot Mr. Calabrese, that Mark then felt at ease that now they're not going to come after Mark."); T. 851 ("And there is no question Mark met with Detective McHugh, and he lied about certain things to Detective McHugh. No question, not disputing that. And you heard from Detective McGinn, what happened, we will go over

---

[2] I do not read defense counsel's later, summary reference to his objection as changing his position on the lack of objection to the portion of McGinn's statement that Jeannot said that he shot Calabrese. T. 591.

4

that a little bit, before Mark finally says, now I feel safe. Now I can tell you what happened. I don't want to be the first one, that Herva Jeannot killed Calabrese. I don't want him coming after my family.").

Second, the trial judge's ruling admitted only the statements by McGinn identified by the prosecutor in the pretrial hearing, i.e., that "I confronted [Orlando], I told him that [Jeannot's] giving it up and he's telling us he did the shooting and he's telling us you made him." T. 164–67. The ruling did not permit McGinn to give the vouching testimony stressed by the majority, i.e., that "I believe that Herva Jeannot was relaying some of the events that really took place that night." T. 620. *That testimony was problematic, but not primarily because it violated the Confrontation Clause; it was inadmissible on multiple grounds – lack of personal knowledge (McGinn was not in the room with Jeannot), opinion by a lay witness ("I believe . . . ."), and vouching for another's statement (regardless of its content). Despite these obvious flaws, however, defense counsel did not object to it, move to strike it, seek a mistrial, or ask for an instruction that the jury disregard it – perhaps because it also vouched for the portion of Jeannot's alleged statement that defense counsel would use

5

to his client's advantage – that Jeannot said he shot Calabrese. Nor did Orlando raise McGinn's vouching statement in the appeal of his conviction, his habeas petition before the district court, or his appeal brief in this Court. While it is still proper to consider it under *Street* – because it goes to the risk that the statement "Orlando paid him to do it" would be misused by the jury (which I discuss below) – it is important to note that the trial judge's pretrial ruling applying *Street* did not authorize McGinn's vouching statement.[3]

## II

Orlando contends that the Appellate Division unreasonably applied *Bruton* and *Street* when it held that admitting the detective's statement that "[Jeannot] said that he was the murderer but that Mark Orlando had paid him to do it" did not violate the Confrontation Clause.[4] Whether that is so

---

[3] As I explain below, when placed in context, McGinn's other references to the "truth" and "truer versions" when testifying about Jeannot's interview do not appear to have been attempts to vouch for Jeannot to the jury.

[4] Orlando also argues that the Appellate Division's ruling was an unreasonable application of *Crawford*. But *Crawford* is of limited guidance in addressing the factual situation here, except insofar as it reaffirms *Street's* holding that admission of out-of-court statements for nonhearsay purposes does not violate the Confrontation Clause. *Crawford*, 541 U.S. at 59 n.9 ("The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. *See Tennessee v. Street*, 471 U.S. 409, 414 (1985).").

boils down to two questions: (1) was there a proper non-hearsay purpose for the statement, which requires considering the degree to which exclusion of the detective's statement would have impeded the jury "in . . . evaluating the truth of [Orlando's explanation as to why he changed his story] and . . . weighing the reliability of his [second and third statements to the police]"; and (2) if so, could the statement nonetheless "have been misused by the jury"? *Street*, 471 U.S. at 414. *Street* suggests that the second question involves consideration of (1) the trial court's limiting instructions; (2) whether the prosecutor made proper use of the statement during the trial; and (3) whether there were "alternatives that would have both assured the integrity of the trial's truth-seeking function and eliminated the risk of the jury's improper use of the evidence." *Id.* at 415–16. There is at least a "possibility fairminded jurists could disagree" about whether the New York courts properly answered these questions.

*Proper Purpose*

The non-hearsay purpose here was similar to the one that prevailed in *Street*: to shed light on the credibility of Orlando's second statement to the police. *See Street*, 471 U.S. at 415 ("Had the prosecutor been denied the

7

opportunity to present Peele's confession in rebuttal so as to enable the jury to make the relevant comparison, the jury would have been impeded in its task of evaluating the truth of respondent's testimony and handicapped in weighing the reliability of his confession."). Orlando claimed that he had lied in his first statement out of fear of Jeannot, but once told of Jeannot's confession, his fear lifted and he gave a truthful account in his second statement.[5] The State would have had no answer to the fear-dissipation narrative had the trial judge sustained defense counsel's objection and excluded only the portion of McGinn's statement in which he said Jeannot implicated Orlando in the murder. Orlando started hinting at his alleged fear of Jeannot as soon as McGinn told him that "Detective McHugh was over there talking to Herva [Jeannot] and he was probably giving us, you know, other facts that happened that night, the truth as to what happened that night." T. 620. At that point, for the first time, Orlando said, "detective, you don't understand," a refrain he then repeated several times before telling McGinn that "he was afraid for his

---

[5] As the majority notes, the second statement was followed by a substantially similar third, written statement. While there were differences between the two the prosecutor stressed in closing argument, they are not material to my dissent.

8

family" and slept next to a shotgun. *Id.* at 623. According to McGinn's testimony, it was not until McGinn added "[Jeannot] stated he was the murderer but that Mark Orlando paid him to do it" that Orlando finally stated "okay, I will tell you the truth" and "then began to tell [McGinn] another version of events that happened that night." *Id*. at 624–25.

That sequence fit both the State's account that Orlando changed his tune only when told he was being accused and Orlando's account that he did so because Jeannot's confession meant he was no longer a threat. But without the piece of McGinn's testimony that he told Orlando Jeannot was implicating him, Orlando's explanation for his change of story would have been a good deal stronger and the overall credibility of his second statement would have been enhanced. And Orlando's defense hinged on the credibility of that statement. In his closing argument, defense counsel focused on convincing the jury that Orlando's second statement was truthful and that his first had been a lie born of his fear of Jeannot. T. 845 ("[E]verything that Mark Orlando had told Detective Cereghino is corroborated by the sixty or so exhibits introduced into evidence. Everything here supports what Mark had said."); *id.* ("Herva . . .

9

[t]hreatened to kill his wife if he said anything. . . . Here's a vicious murder. Why didn't Mark go to the police. I think you see now the answer to that. When I discussed how it was that he gave the first version to the one detective, McHugh, and then to Detective McGinn, finally to Detective Cereghino."). That narrative would have been much more persuasive if supported by the piece of McGinn's testimony defense counsel wanted before the jury – that McGinn told Orlando that Jeannot had confessed to the shooting – and left unrebutted by the remaining piece defense counsel wanted out – McGinn's testimony that Jeannot was also implicating Orlando. Had the trial judge excluded the portion of McGinn's testimony to which defense counsel objected, "the jury would have been impeded in its task of evaluating the truth of [the defendant's second statement]." *Street*, 471 U.S. at 415. The Appellate Division's affirmance of the trial judge's ruling thus reflects a reasonable application of *Street*.

To be sure, the trial judge could have excluded *all* testimony about confronting Orlando with the Jeannot interview – leaving both sides with no explanation about why Orlando changed his story – but no one asked him to do so. And no one asked the Appellate Division to decide whether

10

the he should have done so *sua sponte*. As presented to the New York courts, the issue was limited to whether McGinn could recount Jeannot's statement that Orlando had paid him to commit the murder. Orlando's trial counsel explicitly declined to object to the portion of Jeannot's statement in which he implicated himself. T. 165–166 ("I have no opposition to the fact Mr. Jeannot had indicated that Mr. Jeannot was present and Mr. Jeannot shot him.").

The majority points out that Orlando did not take the stand at his trial. Thus, unlike in *Street*, the State was not forced to rebut a defendant's testimony. But the Court's opinion in *Street* does not suggest that its sanction of non-hearsay use of an accomplice's statement turned on the defendant's election to testify in that case. Nor does it suggest that the government may use such a statement to attack the credibility of a defendant's statements only when the defendant offers them.[6] It was not

---

[6] The two concurring justices in *Street* did make that suggestion, but their views did not carry the day. *See* 471 U.S. at 417 ("With respect to the State's need to admit the confession for rebuttal purposes, it is important to note that respondent created the need to admit the statement by pressing the defense that his confession was a coerced imitation of [his co-defendant's] out-of-court confession.") (Brennan, J., concurring); *see also Furr*, 440 F.3d at 39 ("As the [*Street*] Court issued a *majority* decision endorsed by six justices, however, and

unreasonable for the Appellate Division to read *Street* as allowing non-hearsay use of an accomplice's statement to attack the credibility of, or provide context for, a defendant's statements offered in the government's case in chief. Indeed, several federal courts of appeal have interpreted *Street* the same way. *See, e.g.*, *Lee v. McCaughtry*, 892 F.2d 1318, 1325 (7th Cir. 1990) (reversing order granting habeas relief where state introduced tape of prosecutor's recounting of accomplice's statement to "place into context for the jury the metamorphosis of [the defendant's] accounts of events that took place at the murder scene": "Since the prosecutor's account of [the accomplice's] statements were offered not for the truth of those statements, but to explain the context of the defendant's change in his story, they are not hearsay, and, absent complicating circumstances, would not have violated the confrontation clause." (citing *Street*)); *Furr*, 440 F.3d at 36–41 (state court's application of *Street* "readily passes muster" under Section 2254 where prosecutor introduced accomplice's statement regarding gun and defendant's threatening letter to accomplice in its case in chief to support witness intimidation charge); *Gover v. Perry*, 698 F.3d

---

not merely a *plurality* opinion, the concurrence cannot be considered a viable Court holding.").

12

295, 307 (6th Cir. 2012)  ("Given the fact that there was precedent at the time that providing background to a police investigation through out-of-court statements was a permissible nonhearsay purpose, we must conclude that it was not unreasonable. It is certainly within the large scope of conclusions 'fairminded jurists' could reach, even if others disagreed.").

*Risk of Misuse by Jury*

While *Bruton* held that courts cannot expect juries to follow limiting instructions when, in a joint trial, they hear a co-defendant's statement implicating a defendant, the Supreme Court has treated that holding as a "narrow exception" to the "almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 207 (1987). Further, the exception applies "when the facially incriminating confession of a nontestifying codefendant is introduced *at their joint trial*." *Id.* (emphasis added). *Street* made the same point more generally, stating that "[t]he assumption that jurors are able to follow the court's instructions fully applies when rights guaranteed by the Confrontation Clause are at issue." *Street*, 471 U.S. at 415 n.6.

13

Here, the "invariable assumption" that jurors follow limiting instructions applies, because this case is much closer to *Street* than to *Bruton*. First, it was not a joint trial; indeed, like the Court in *Street*, the New York Appellate Division upheld the admission of an accomplice's statement against the defendant after the two had been severed for trial under *Bruton*. Second, again as in *Street*, the statement was not admitted for its truth and the jury was instructed not to consider it for that purpose. In *Bruton*, by contrast, the issue was whether, in a joint trial where a co-defendant's statement implicating both Bruton and the co-defendant was admitted, the jury could follow an instruction to consider the co-defendant's statement *for its truth* against the co-defendant while putting the same statement out of its mind entirely when deciding on Bruton's guilt. *Bruton*, 391 U.S. at 131 ("In joint trials, however, when the admissible confession of one defendant inculpates another defendant, the confession is never deleted from the case and the jury is expected to perform the overwhelming task of considering it in determining the guilt or innocence of the declarant and then of ignoring it in determining the guilt or innocence of any codefendants of the declarant. A jury cannot segregate

14

evidence into separate intellectual boxes." (internal quotation marks omitted)). The Appellate Division thus properly cited *Street* as the most pertinent Supreme Court precedent here. *People v. Orlando*, 61 A.D.3d 1001, 1002 (N.Y. App. Div., Second Dep't. 2009).

To be sure, applying *Street* properly involves more than just admitting any statement by an accomplice and instructing the jury not to consider it for its truth. Specifically, the Court's analysis in *Street* suggests that, in deciding whether to uphold the admission of an accomplice's out-of-court statement for a non-hearsay purpose under the Confrontation Clause, courts should consider (1) the adequacy of the instructions; (2) the manner in which the out-of-court statement was used at trial, 471 U.S. at 416; and (3) whether there were "alternatives that would have both assured the integrity of the trial's truth-seeking function and eliminated the risk of the jury's improper use of evidence," *id.* at 415. I consider these factors below.[7]

---

[7] In its brief ruling, the New York Appellate Division did not canvass these factors, but it did cite *Street* and point out the non-hearsay purpose of the statement and the trial court's limiting instructions. *People v. Orlando*, 61 A.D.3d 1001, 1002 (App. Div. 2d Dep't 2009). In *Furr v. Brady*, the First Circuit rejected a Section 2254 petition asserting that the state court had unreasonably applied

### 1. Limiting Instructions

Both when McGinn's testimony was admitted and in the final charge, the trial judge instructed the jury as follows:

> Ladies and gentlemen, you have been permitted to hear testimony about remarks made to the defendant by Detective McGinn about statements allegedly made by Herva Jeannot. You're to consider this testimony only when considering the circumstances under which the defendant himself may have made statements and for no other purposes. You are to completely disregard any statement allegedly made by Herva Jeannot when considering evidence against the defendant.
>
> Any statement allegedly made by Herva Jeannot is not evidence against the defendant and may never be considered as evidence against the defendant. You are not to concern yourself with whether Herva Jeannot did or did not make any

---

*Street* because it had failed expressly to consider these factors. *Furr v. Brady*, 440 F.3d 34, 39–40 (1ˢᵗ Cir. 2006)("[T]he [*Street*] Court did not purport to prescribe a mandatory checklist of factors to be considered in every case. Rather, it noted, absent other circumstances, it is sufficient that the codefendant statement is nonhearsay – viz., not admitted for the truth of the matter asserted, and provided the court gives a limiting instruction to that effect. . . . Thus the determination as whether the general rule of admissibility in *Street* applies is assessed case by case, based upon the presence of whatever special circumstances would create an unreasonable risk that the jury disregarded their instructions."). In any event, the brevity of the Appellate Division's consideration of the issue does not diminish the deference we owe its application of *Street* under 28 U.S.C. Sec. 2254. *Harrington*, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing that there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for Section 2254(d) applies when a 'claim,' not a component of one, has been adjudicated.").

statements to the police, and if he did, what those statements may have been or whether or not they were true.

I direct you in this regard and I will direct you again in my closing instructions to you.

T. 624; *id.* at 930–31.[8]

I do not agree that this instruction was "decidedly unclear." Maj. Op. at n.16. On its face, it directs the jurors to disregard for *any* purpose any statement by Jeannot himself, but lets them consider how Orlando reacted when McGinn *told* him that Jeannot had made a statement implicating him. I do not to see how the instruction could have been made much clearer, and, apparently, neither did Orlando's counsel. His trial counsel did not object to the instruction, and his appellate counsel did not challenge it before the Appellate division. T. 136. Federal courts of appeal have found vaguer, less detailed instructions to be reasonable applications of *Street*. *See Furr*, 440 F.3d at 39 n.3 (holding that the state trial court's limiting instruction was adequate under *Street* even though it had not explicitly instructed the jury that it could not consider the "truth" of the statement); *Lee*, 892 F.2d at 1321, 1325–26 (upholding the denial of a § 2254

---

[8] The first time the trial judge gave this instruction, the transcript does not reflect that he said "and" before "if he did, what those statements may have been or whether or not they were true."

17

petition where the trial court instructed the jury once – when the evidence was admitted – that "[i]t's a sequence of events. That is one thing that shows why hearsay may be offered just to allow us to see what happened next . . . [Y]ou are not to take as substantive evidence the statement of Mr. Williams, because it is not here in Court. But it is offered to show you what happened next; okay? And not to take it as substantive evidence or as evidence that it actually happened."). *Cf. Adamson v. Cathel*, 633 F.3d 248, 258–259 (3d Cir. 2011) (granting a Section 2254 petition where an accomplice's out-of-court statements were offered against the defendant for a non-hearsay purpose but the state court failed to give any limiting instruction).

The majority contends that McGinn's vouching statement made the instruction unclear, but as noted, that statement was not a product of the trial court's ruling and there was no objection to it or request for an instruction that the jury ignore it. Even so, the trial judge's repeated admonition that the jury was not to consider whether Jeannot made any statement or whether it was true addressed McGinn's improper vouching for Jeannot, which was limited to a single sentence, i.e., "I believe that

18

Herva Jeannot was relaying some of the events that really took place that night." T. 620. McGinn's other statements about "the truth" and "truer versions" when referring to Jeannot were directed at Orlando, not the jury, and when viewed in context and in the light of the limiting instruction, were part of McGinn's attempt to induce Orlando to provide more detail about the murder. T. 620 ("I went back in and I told Mr. Orlando that Detective McHugh was over there talking to Herva [Jeannot] and he was probably giving us, you know, other facts that happened that night, the truth as to what happened that night. Now would be the time for Mark Orlando to tell us what was going on."); T. 621 ("I went back into the room. . . . Again, I explained to Mr. Orlando that Herva Jeannot was, in fact, giving up the, what we felt were truer versions of the events of Bobby Calabrese's murder. . . . I told him that Herva Jeannot had given up where the gun was and that the defendant should at this point, if he wants his version of the story told tell us the truth at this point.").

Nor do I agree that the prosecutor undermined the trial judge's limiting instructions in his closing argument. Maj. Op. at 31. The prosecutor's only reference to McGinn's testimony about Jeannot's

19

statement was followed immediately by a comment about why Orlando changed his story – the very non-hearsay use for which the testimony was admitted: "And Detective McGinn finally says, look, Herva's giving it up. Herva's telling us everything. So, come on. He's telling us he did the shooting and you paid him. *And the defendant realizes the time is now.* I don't care what story I had together at all. I am telling the story and he la[t]ches onto it and he can't get it straight."  T. 895 (emphasis added.). This was consistent with the trial judge's instruction that the jury was to "consider [McGinn's recounting of Jeannot's] statement only when considering the circumstances under which the defendant himself may have made statements and for no other purpose." T. 930.

2. Use of the Statement at Trial

While he made only one reference to Jeannot's reported statement in his closing argument, the prosecutor made multiple references to Orlando's paying Jeannot, and I agree with the majority that the evidence supporting those references was weak – the presence of similar hundred-dollar bills in both Orlando's and Jeannot's homes. That circumstance makes this case harder than *Street*, because it raises the possibility that the

20

jury might have, despite the judge's clear instructions, turned back to Jeannot's reported accusation and considered it for its truth to find more support for the prosecutor's references to payment during closing argument. Even clear jury instructions can be ineffective in some circumstances, as *Bruton* and *Street* both teach.

As the majority notes, however, the state did not have to prove that Orlando paid Jeannot to kill Calabrese. What it had to prove was that Orlando aided and abetted the killing, and payment was not an element of that crime. In addition, there was evidence other than payment from which the jury could have found aiding and abetting – Orlando's soliciting Calabrese to meet in an isolated area, driving Jeannot to and from the scene, and stopping his car to enable Jeannot to take a final shot at Calabrese and discard the gun and ammunition, among others. Determining whether Orlando paid Jeannot was not a necessary part of the jury's task.

Further, the prosecutor's references to payment in closing argument were brief, and his central theme was to emphasize the incriminating parts of Orlando's second statement together with the implausibility of the part

21

in which he cast himself as a surprised bystander at the murder scene rather than an accomplice. *E.g.*, T. 871 ("You don't think Herva Jeannot needed an accomplice, do you. Why would Jeannot need an accomplice. Why would Herva Jeannot need someone to get him in and out of that unfamiliar area. Why would Herva Jeannot need someone to lure Bobby into that desolate corner of Long Beach with the promise of a $17,000 payment. Why would Herva Jeannot need someone to distract Bobby. . . ."); *id.* at 883–85 ("[A]sk yourselves, what would an innocent bystander in that situation have done. . . . Your common sense tells you that an innocent bystander would have been in shock. . . . How about our defendant. . . . He's just seen Herva gun down Bobby. . . . Herva says let's go and what does he do?  He climbs into the Verona. . . . The defendant starts to drive around Bobby's dying body. The defendant tells Herva he notices his feet was [sic] still moving, there was a little life left in him. . . . So I stopped. Herva got out, Herva went over to the body and tried to shoot him a couple more times, but the gun wouldn't go off. So, Herva got back in. I drove him away. Is that the behavior of an innocent bystander in shock over what he's just seen?"); *id.* at 888 ("Now we're pulling up outside [a

22

friend's] house and the defendant gets out of the car and Herva stays in the car. . . . And you have proof beyond any reasonable doubt that the defendant was right in the middle of it. . . . Do you think if the defendant were really an innocent bystander, . . . who had just seen Herva execute Bobby on the street, that Herva would have let the defendant go into the [friend's] house on his own. . . .").

Finally, while I cannot say that there was *no* risk of juror misuse of Jeannot's reported statement in light of the weaknesses in the State's evidence of payment, *Street* suggests that the existence of such a risk is not dispositive. Rather, the risk of misuse must be weighed against the risk of excluding critical evidence from the jury's consideration. *Street*, 471 U.S. at 415 ("[T]here were no alternatives that would have both assured the integrity of the trial's truth-seeking function and eliminated the risk of the jury's improper use of evidence.").[9] Here, the Appellate Division weighed

---

[9] As for "alternatives" to admitting the detective's statement in full, limiting the statement to "Jeannot said he was the murderer" would not have "assured the integrity of the trial's truth-seeking function." 471 U.S. at 415. As discussed above, this redaction, which defense counsel sought, instead would have artificially enhanced the credibility of Orlando's second statement by supporting his account that he gave it because Jeannot's own confession had removed his fear that Jeannot would harm him and his wife if he told the truth.

23

the risk of misuse against the need to admit the detective's testimony about confronting Orlando with the accomplice's reported statement to enable the jury to consider all the facts bearing on the critical issue of the credibility of Orlando's second statement. It also factored into the balance the trial court's instruction directing the jury to confine its assessment of that evidence to the nonhearsay purpose for which it was admitted. Even if the Appellate Division's ruling ultimately struck the balance incorrectly, it reflected an application of *Street* about which "fairminded jurists could disagree." *Harrington*, 562 U.S. at 101; *id*. at 101–02 ("For purposes of Sec. 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. . . . It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." (internal quotation marks omitted)).

For these reasons, I would affirm the judgment of the district court denying the writ.